# 24-3308-cv

# United States Court of Appeals
## for the
## Second Circuit

CHARLES MILLS, CRAIG SOTOMAYOR, BRADEN HOLLIDAY,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (New York City)

———————————————————————

## BRIEF FOR PLAINTIFFS-APPELLANTS

———————————————————————

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ...................................................................... i

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES PRESENTED FOR REVIEW .................................................. 1

STATEMENT OF THE CASE ............................................................... 1

Relevant Proceedings Below ............................................................... 11

STANDARD OF REVIEW ................................................................... 12

I. THE DISTRICT COURT MISAPPLIED THE *BRUEN* TEST .......................... 13

    A. The Test to be Applied in Second Amendment Challenges .................. 13

    B. The Threshold Inquiry: Regulation of Arms-Bearing Conduct ............. 14

    C. Second Amendment Plaintiffs Have No Burden to Prove – or Plead – that the Regulations Are "Foreclosed by the Plain Text" ........................... 15

    D. 'Permanent Deprivation' is Not Part of the Bruen Test ........................ 16

    E. The District Court Misunderstood the Threshold Inquiry ..................... 16

    F. 'Compromise' Analysis Was Rejected in *Heller* .................................. 18

II. THE DISTRICT COURT IMPROPERLY MERGED THE REGULATIONS WITH THE RIGHT ................................................... 18

    A. 90-Day Waiting Period & Purchase Authorization, Registration, and Inspection .......................................................................... 19

    B. One Handgun Carry (Backup Gun Rule) .............................................. 21

    C. Limiting the Number of Handguns Registered to a License ................. 22

D. Exorbitant Licensing Fees ..................................................... 23

III. THE COMPLAINT ALLEGES AN INJURY-IN-FACT TRACEABLE
TO THE PURCHASE AUTHORIZATION, REGISTRATION,
AND INSPECTION RULES ...................................................... 25

CONCLUSION ................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. James*,
  120 F.4th 941 (2d Cir. 2024).................................................................. 4, 26, 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 12

*Beckwith v. Frey*,
  2025 WL 486830 (D. Me. Feb. 13, 2025) ............................................. 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................. 12

*Carter v. HealthPort Techs.*, LLC,
  822 F.3d 47 (2d Cir. 2016)................................................................... 26

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................ 13, 18, 21, 25

*Eliahu v. Jewish Agency for Israel*,
  919 F.3d 709 (2d Cir. 2019)................................................................. 12

*Emilee Carpenter, LLC v. James*,
  107 F.4th 92 (2d Cir. 2024)................................................................. 12

*Emilee Carpenter, LLC v. James*,
  575 F. Supp. 3d 353 (W.D.N.Y. 2021) ................................................. 26

*Gelmart Indus., Inc. v. Eveready Battery Co.*,
  120 F. Supp. 3d 327 (S.D.N.Y. 2014)................................................... 26

*Knife Rts., Inc. v. Vance*,
  802 F.3d 377 (2d Cir. 2015)................................................................. 25

*Kwong v. Bloomberg*,
  723 F.3d 160 (2d Cir. 2013)................................................................. 24

i

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) ................................................................ 4, 13, 16

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022) ....................................................................... Passim

*Srour v. New York City, New York*,
    699 F. Supp. 3d 258 (S.D.N.Y. 2023) .......................................... 19

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .......................................................... 12

*United States v. Rahimi*,
    602 U.S. 680 (2024) ................................................................... Passim

**Statutes**

28 U.S.C. § 1291 .............................................................................. 1
28 U.S.C. § 1331 .............................................................................. 1
N.Y.S. General Business Law § 898 ................................................ 2

**Rules**

Fed. R. Civ. P. 12(b) ............................................................ 1, 4, 11, 12

**Regulations**

38 R.C.N.Y. § 5-25 .................................................................. passim
38 R.C.N.Y. § 5-22 ......................................................................... 6, 8
N.Y.C. Administrative Code § 10-302.1(a) ...................................... 5

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction was proper in the district court pursuant to 28 U.S.C. § 1331, as the causes of action arose from violations of the U.S. Constitution. The Opinion and Order appealed from, which dismissed the federal complaint in full, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), was entered by the Clerk of the Court on December 4, 2024. Appellants timely filed a Notice of Appeal on December 17, 2024. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1) Whether the district court misapplied the test for Second Amendment challenges set forth in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) and in *United States v. Rahimi*, 602 U.S. 680 (2024) when dismissing the complaint pursuant to Fed. R. Civ. P. 12(b)(6).

2) Whether Appellants alleged an injury-in-fact traceable to New York City (the "City") sufficient to establish Article III standing and avoid dismissal under Fed. R. Civ. P. 12(b)(1).

## STATEMENT OF THE CASE

Appellants Charles Mills ("Mills") and Craig Sotomayor ("Sotomayor") hold valid New York City (the "City") handgun licenses. Mills and Sotomayor were fully vetted by the New York City Police Department License Division, underwent a

1

rigorous criminal and mental health background investigation through federal and state databases, and were deemed by the City to possess "good moral character"[1] as borne out by the License Division's issuance of their gun licenses.

In the City, anyone seeking to acquire a firearm[2] must (i) have a license issued by the License Division and (ii) may only purchase a firearm from a licensed gun dealer/federal firearm licensee (FFL). In New York State, no purchase of a firearm from a FFL may be completed unless a federal background check is performed through the New York State Police (as a point-of-contact), which directly performs an inquiry with NICS[3] to ascertain whether the purchaser is disqualified from possessing firearms and ammunition under state or federal law. New York State General Business Law § 898.

Notwithstanding this comprehensive and painstaking vetting process, every City licensee who purchases a firearm from a FFL after being approved by NICS to receive a firearm, is banned from leaving the store with it. If any licensee who, after being approved by NICS to take possession, and paying for the firearm, takes possession of the firearm and leaves the FFL – they (and the FFL) have committed a crime. The City requires people not only to obtain a license, but to continue to

---

[1] "[G]ood moral character…for the purposes of this article, shall mean having the essential character, temperament and judgement necessary to be entrusted with a weapon and to use it only in a manner that does not endanger oneself or others." Penal Law § 400.00(1)(b).
[2] The term "firearm" as used herein refers generally to handguns, rifles, and shotguns.
[3] National Instant Criminal Background Check System.

traverse additional administrative hurdles to acquire arms: obtaining a purchase authorization form, completing the form and returning it to the License Division with a bill of sale, photographs and inspection of the firearm, and registration of the firearm with the License Division. The licensee must then wait for the License Division to create, then issue, an 'amended' license because the City requires every firearm to be registered to the specific person who holds the license to which the firearm is registered.

Under the City's 90-day rule, no licensee may acquire – and no FFL may sell or transfer to any licensee - more than one (1) firearm within in a 90-day timeframe. Violation of this regulation will result in criminal penalties, license revocation, and the mandatory confiscation of <u>all</u> firearms.

The City also prohibits licensees from carrying a backup gun for self-protection and no more than two handguns may be registered to a carry license (and only one to a home premise license); with permission, additional handguns may be approved.

People who seek to obtain a license to possess arms in the City are subject to the City's exorbitant licensing and renewal fees which, at $428.50, grossly exceed the $10 statutory cap imposed on every other jurisdiction in New York State, except Nassau County.

No other constitutional right requires the People to pay money to, or seek permission from, the government as a condition precedent to its exercise. In New York City, the Second Amendment does not even reach "second class" status [see, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780], it remains a "privilege" bestowed by the government.

Appellants met the threshold burden of establishing, under the *Bruen* test, that the City's regulations restrict arms-bearing conduct. Yet, as described below, the district court misapplied the *Bruen* test, held Appellants to various unorthodox burdens that have been definitively laid to rest by the Supreme Court's Second Amendment jurisprudence, warranting reversal of the district court opinion and order and reinstatement of the federal complaint.

### *The Opinion and Order Below*

The district court opinion and order appealed from (the "order") dismissed Appellants' Second Amendment claims, with prejudice, under Fed. R. Civ. P. 12(b)(1) and (6). The district court misapplied and misunderstood the (i) text, history and tradition analysis to be applied in Second Amendment challenges; (ii) the viability of constitutional challenges to "exorbitant licensing fees" under *Bruen*; and (iii) threshold consideration for a plaintiff to establish standing in this Court - alleging a "personal stake in the outcome of the controversy…to justify exercise of

the court's remedial powers..." *Antonyuk v. James*, 120 F.4th 941, 976 (2d Cir. 2024).

### *The New York City Rules Challenged Below*

The federal complaint challenges the constitutionality of various New York City firearm regulations that "regulate arms-bearing conduct": (i) a 90-day waiting period to acquire arms; (ii) requiring purchase authorization, registration, and inspection before taking possession of arms that have been bought-and-paid-for by a licensee after a state and federal background check by a licensed gun dealer; (iii) prohibiting the carriage of a back-up handgun; (iv) a limitation of two handguns registered to a concealed carry license; and (v) exorbitant application and renewal fees [JA6-27].[4]

### *The 90-Day Waiting Period*

New York City Administrative Code ("N.Y.C. Admin. Code") § 10-302.1(a) prohibits licensed gun stores from (i) transferring and/or selling a firearm to any individual who has received/purchased a firearm within the past 90-days and (ii) from transferring/selling more than one firearm to any licensee as part of the same transaction [JA16]. Section 10-302.1(b) prohibits licensees from (i) purchasing more than one firearm as part of the same sales transaction; and (ii) more than one

---

[4] Citations to the Joint Appendix are noted herein as ["JA___].

firearm during a 90-day period [JA16]. The transfer of one from a "premise" (residence) license to a "carry" license also starts the 90-day clock running [JA16].[5]

The 90-day waiting period for handgun purchases and transfers is separate and apart from the 90-day clock for purchases and transfers of rifles and shotguns [JA16]. Violations of the 90-day rule are a Class A misdemeanor punishable by one year in jail and a fine up to $1,000, license revocation (for the person and the gun dealer), and the automatic forfeiture and destruction of the firearms involved [JA16]. No City gun store will violate the 90-day restriction [JA16].

The 90-day rule exempts people employed as law enforcement and peace officers, allowing them unlimited access to and acquisition of arms for their personal use [JA17].

### Permission to Purchase, Inspection, and Registration

38 RCNY § 5-22(a)(8) prohibits licensees from owning any handguns that are not registered to / listed on their license, whether the license is for one's premises or for concealed carry [JA14].

Under 38 RCNY § 5-22(a)(9) and (10) licensees "shall not" purchase or replace a handgun prior to obtaining written permission from the Division Head, License Division (see Handgun Purchase Authorizations); a handgun may be

---

[5] NYC Admin. Code § 10-302.1 also exempts, *inter alia*, motion picture, television and video production companies, public agencies "in furtherance of official business."

replaced or purchased only by requesting permission in writing from the Division Head, License Division.

Under 38 R.C.N.Y. § 5-25 "Handgun Acquisition Requirements," licensees are prohibited from taking possession of a handgun at the point of purchase. Before taking possession of an already-purchased-handgun, the licensee must apply for and obtain permission from the License Division. No licensee may take possession of a handgun unless and until (i) the licensee completes and submits an "authorization form" with the bill of sale/receipt with the make, model, caliber, and serial number; the name address, and license number of the purchaser and the seller; and (ii) the handgun "has been inspected by the License Division personnel and entered on the license." Requests for inspection must be made through email and/or a[6]n online portal within 72 hours of the purchase[7] [JA12-14].

Under § 5-25(g) [formerly 5-25(d)], the number of handguns that may be listed on/registered to a license is limited to (i) one for a premise license "except" handguns will be approved additional where the licensee proves "appropriate safeguarding" and "compliance with mandatory waiting periods" [including the 90-

---

[6] The City's August 12, 2024 "Emergency Rules" [JA31-33] amended 38 RCNY 5-25(d)(4) (the number of handguns allowed to be registered to/listed on a handgun license), now identified as § 5-25(g) [JA28, 31]. The restriction remains unchanged: the City imposes a discretionary limitation on the number of handguns a licensed person may list/register to their home (premise) license and/or their carry license. Mills and Sotomayor continue to have Article III standing to challenge the rule as amended.

[7] The License Division asks licensees to allow fourteen (14) business days to receive the Purchase Authorization and amended license [JA14].

day rule] and (ii) two for a carry license "except" that requests are subject to the requirements for a premise license, and only one handgun may be carried at one time.[8]

### No Back-up Firearm: One Handgun Carry Limitation

38 R.C.N.Y. § 5-22(a)(7) and § 5-25(g) restrict licensees holding a "carry" or "special carry" type of license to carrying only carry one handgun on their person at any time [JA17]. A violation of this rule is a Class A Misdemeanor subject to one-year of incarceration, license revocation, 3 years of probation, and/or a fine of up to $1,000 [JA17].

### Exorbitant Application and Renewal Fees

Individuals applying for a handgun license in New York City must pay the government $428.50 and obtain permission before exercising a preexisting right[9] [JA11]. Licenses automatically expire three (3) years from issuance, which requires another $428.50 to renew the license [JA11]. By state law, the handgun licensing fee in every county except the City and Nassau County, is capped at a maximum of $10, and there is no statute authorizing a 'fingerprinting fee' [JA18]. Penal Law § 400.00(14).

---

[8] Appellants should be granted leave to amend their complaint to substitute § 5-25(d) with § 5-25(g).
[9] $340 application fee and $88.50 fingerprinting fee.

### *Appellants Mills, Sotomayor, and Holliday*

Appellants are residents of New York State with no disqualifiers to the possession of firearms under state and federal law [JA17, 19, 22].

### Charles Mills

Charles Mills ("Mills"), a resident of Queens, holds two New York City handgun licenses: premises (residence) and concealed carry, as well as a rifle/shotgun license [JA19-20]. Mills challenges the (i) purchase authorization, registration, and inspection rules (ii) the number of handguns allowed on a concealed carry license; (iii) the 90-day waiting period; and (iv) the prohibition on carrying more than one handgun on the person at a time. Violations of these regulations subject him to criminal penalties, revocation of all firearm licenses, and the mandatory forfeiture of his firearms [JA19-22].

### Craig Sotomayor

Craig Sotomayor ("Sotomayor") is a resident of Nassau County, New York who holds an unrestricted New York State concealed carry handgun license as well as a concealed carry handgun license issued by the City [JA22-23]; see Penal Law § 400.00(6).

Sotomayor has an impressive and sizeable handgun collection of revolvers and semi-automatic pistols that vary in model type, caliber, and size. Sotomayor carries a handgun on a regular basis for self-defense, and many times he carries a

9

backup handgun. Sotomayor's choice of which handgun(s) to wear depends on a number of factors, from size, caliber, weather, clothing, where he will be traveling to and his anticipated activities [JA22-23].

Like Mills, Sotomayor challenges the City's two-handgun registration limitation for concealed carry licenses because, under the challenged regulations, Sotomayor will be subject to criminal penalties if he (i) carries a handgun that he lawfully owns but is not also listed on his City license (based on the City's 2-handgun limitation on a carry license) and (ii) carries a second (backup) handgun on his person while in the City [JA23-24].

Sotomayor routinely carries a backup handgun in public during his travels outside of the City, but he is foreclosed from the same conduct when he travels to the City, or he faces criminal and civil penalties under the City's rules [JA23-24].[10]

### Braden Holliday

Braden Holliday ("Holliday") challenges the exorbitant licensing fees charged by the City requires before, and as a condition of, exercising the right to possess firearms for self-defense [JA18]. The City's fees are an absolute bar to Holliday's right to possess handguns for self-defense [JA18].

---

[10] New York City prohibits regular citizens from carrying a backup handgun but places no limit on the number of handguns that an off-duty police officer can carry at one time [JA24].

10

### **Relevant Proceedings Below**

On August 23, 2023, Appellants filed their complaint in the United States District Court for the Southern District of New York, which was assigned to the Hon. Paul A. Crotty [JA1]. On December 8, 2023, the City filed a motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [JA3; DE 13-15]. On December 12, 2023, the district court directed the City to submit a status letter reflecting how, if at all, the decisions in *Antonyuk v. Chiumento* and *Gazzola v. Hochul* affect the City's motion [JA3], which was filed on December 19, 2023 [JA3; DE 16].

On January 22, 2024, Appellants filed an opposition to the motion to dismiss [JA4; DE 19]; on February 20, 2024, the City filed its reply [JA4; DE 23]. On April 15, 2024, the matter was reassigned to the Hon. Jed S. Rakoff [JA4]. On August 16, 2024, the parties filed letters describing their respective positions on the effect of *United States v. Rahimi*, 602 U.S. 680 (2024) on the City's pending motion to dismiss, if any [JA4; JA28; JA35; DE24, 25]. The City's position letter also informed the court of "Emergency Rules" amending 38 RCNY 5-25(d)(4) (the number of handguns allowed to be registered to/listed on a handgun license), now identified as § 5-25(g) [JA28, 31].

On September 25, 2024, the district court [Rackoff, J.] issued what was described as a "bottom-line order" informing the parties that the City's motion to

11

dismiss was granted and that a "memorandum explaining the reasons for this ruling will issue in due course, at which time final judgment will be entered" [JA4; JA37; DE26].

By Opinion and Order dated December 4, 2024, the district court dismissed the federal complaint in full, with prejudice, and directed the Clerk of the Court to enter judgment [JA5; JA39; DE27]. On December 5, 2024, judgment was entered [JA5]. Appellants timely filed a Notice of Appeal on December 17, 2024 [JA5; JA38; DE29]. This appeal follows.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for failure to state a claim, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor. *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) citing, *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)], which requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also, *Eliahu v. Jewish Agency for*

*Israel*, 919 F.3d 709, 712 (2d Cir. 2019) (per curiam) (discussing standards of review for motions to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)).

## I. THE DISTRICT COURT MISAPPLIED THE *BRUEN* TEST

The Second Amendment "presumptively guarantees" the possession and carriage of arms [*Bruen*, 597 at 33; *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)] and the right to keep and bear arms is "among the fundamental rights necessary to our system of ordered liberty." *Rahimi*, 602 U.S. at 690 quoting, *McDonald v. Chicago*, 561 U.S. 742, 778 (2010) (internal quotes omitted).

### A. The Test to be Applied in Second Amendment Challenges

The only test to be applied in a Second Amendment challenge, which was applied in *Heller* and every Second Amendment challenge in the Supreme Court since is as follows:

> "…when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, 597 U.S. at 17 (citation omitted).

The district court failed to apply and/or misapplied the *Bruen* test and, as such, committed several legal errors, some of which are reminiscent of the 'interest balancing' tests flatly rejected in *Bruen,* including (i) placing the burden on Appellants to show that the City's regulations "are foreclosed by the text of the Second Amendment" (ii) concluding, at the 12(b)(6) stage, that the City's rules are 'constitutional', which improperly relieved the City of its burden under *Bruen* to justify its regulations;[11] (iii) erroneously merging the regulations with the conduct being regulated; (iv) dismissing Second Amendment claims because the regulations do not "ban" the possession and/or carriage of firearms altogether; and (v) rejecting the Supreme Court's invitation to challenge "lengthy wait times in processing license applications [and] exorbitant fees [to] deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 39 n. 9.

## B. The Threshold Inquiry: Regulation of Arms-Bearing Conduct

The threshold inquiry in Second Amendment challenges is whether the government is regulating "arms-bearing conduct." If so, then the government "bears the burden to justify its regulation." *Rahimi*, 602 U.S. at 691.

---

[11] As there is no Supreme Court or Second Circuit precedent addressing the regulations challenged by Appellants, the district court's procession to step two of the *Bruen* test at the 12(b)(1) and/or (6) stage was patently improper.

14

### C. Second Amendment Plaintiffs Have No Burden to Prove – or Plead - that the Regulations Are "Foreclosed by the Plain Text"

Interestingly, the district court answered the threshold inquiry in the affirmative, correctly concluding that the NYC Admin Code and Title 38 of the Rules of the City of New York "restrict conduct protected by the Second Amendment" [JA39]. This conclusion should have ended the court's analysis and resulted in the denial of the City's motion under 12(b)(6). Instead, the court disregarded its own conclusion and proceeded to impose requirements based on interpretations lacking any resemblance to the *Bruen* test, turning the test applied in *Bruen* and *Rahimi* on its head.

First, the district court held faulted Appellants for "fail[ing] to show that the challenged regulations are foreclosed by the text of the Second Amendment" [JA60] – a burden created by the court from whole cloth. An analysis of text, history, and tradition is neither a plaintiffs' burden nor properly entered into at the 12(b)(6) stage, where the only inquiry is whether the plaintiffs have stated a claim for which relief may be granted. In a Second Amendment challenge, the plaintiffs' showing is satisfied where the government's regulations affect 'keeping' and/or 'bearing' arms.

The burden then decidedly – and immediately – shifts to the government. The "Government must show that the restriction is consistent with the Nation's historical tradition of firearm regulation." *United States v. Rahimi*, 602 U.S. 680, 689 (2024) quoting, *Bruen*, 597 U.S. at 24.

15

The threshold inquiry here yielded a resounding 'yes', which should have resulted in the finding that Appellants satisfied their burden at step one of the *Bruen* test.

### D. 'Permanent Deprivation' is Not Part of the *Bruen* Test

The district court failed in its attempt to distinguish this case from "all of the three Supreme Court cases" [JA56-57] (discussing *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010)*, Bruen*, and *Rahimi*) by reasoning that "none of the regulations here operates to permanently deprive applicants of their right to own and carry firearms" [JA57].

No Supreme Court case has held that governmental regulations of arms may only be challenged if they "permanently deprive [the plaintiffs] of their right to own and carry firearms – whether at the pleading stage or otherwise. That query has long been rejected by the Supreme Court. Adopting that logic would insulate ***every*** restriction from constitutional scrutiny, in the absence of a complete ban. No common sense reading of *Heller, McDonald, Caetano v. Massachusetts, Bruen, or Rahimi* supports the district court's interpretation of the analysis to be conducted in Second Amendment challenges.

### E.  The District Court Misunderstood the Threshold Inquiry

According to the district court, Appellants' view that the City's regulations impact their right to possess and/or carry handguns (and, thus satisfy step one) is

16

"far too facile" and "would essentially eliminate the step-one analysis whenever a regulation has the slightest connection to guns" [JA57].

Relying on the language in *Bruen* that "nothing in that decision 'should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit]" [JA58], the district court overlooked the fact that *Bruen* did not involve a challenge to *licensing generally*.

But *Bruen* involved a challenge to a specific provision of New York State's handgun licensing scheme: the "proper cause" requirement to obtain a license to carry handguns concealed – not a challenge to licensing generally.

Likewise, Appellants challenge specific provisions of the City's firearm licensing scheme – not 'licensing generally.' This case and *Bruen* each involve challenges to regulations that restrict Appellants' arms-keeping and arms-bearing conduct.

Applying the district court's logic to the facts in *Bruen*, one could make any number of specious arguments: the plain text does not protect "carrying a handgun concealed" or "carrying a handgun in the absence of an imminent threat," "carrying a firearm at night," "carrying a loaded firearm," or "purchasing ammunition" simply because the specific words of a particular hypothetical are 'not part of the text.' Such interpretations manipulate the threshold inquiry and shield any government

17

restriction on the right from constitutional scrutiny short of an outright ban – a result repugnant to the Second Amendment and the Supreme Court's text, history and tradition analysis.[12]

### F.  'Compromise' Analysis Was Rejected in *Heller*

The district court also erroneously found that Appellants failed to state a claim under the Second Amendment because "under the challenged rules, anyone with a general desire to obtain a gun can obtain one upon fulfilling certain predominantly non-discretionary administrative requirements and paying a fee" [JA57].

The *Bruen* test leaves no room the 'alternatives' as a justification for an unconstitutional firearm regulation. See e.g., *Heller,* 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

## II.   THE   DISTRICT   COURT   IMPROPERLY   MERGED   THE REGULATIONS WITH THE RIGHT

When determining whether Appellants' conduct fits within the plain text of the Second Amendment, the district court improperly merged the restriction being challenged with the protected conduct. Rules prohibiting more than one transfer within a 90-day period, restricting the number of handguns carried for self-defense,

---

[12] Appellants' view in this case does not "sweep into the scope of the protections afforded by the Second Amendment any regulations affecting firearms" [JA58] only those affecting the possession and/or carriage of bearable arms.

requiring permission every time  person seeks to acquire another firearm - are not part of the *conduct* being regulated.

The City's regulations restrict how, when, in what manner, and whether Appellants may possess and/or carry firearms – decidedly satisfying the threshold inquiry under *Bruen*.

### A.  90-Day Waiting Period & Purchase Authorization, Registration and Inspection

The plain text of the Second Amendment is unqualified – free of waiting periods and governmental permission. Any restriction of the ability to freely possess and/or carry arms requires the government to prove that the regulation is consistent with this Nation's historical traditions. *Bruen*, 597 U.S. at 17.

By concluding that "nothing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time" [JA60] the district court erroneously merged the restriction with the right itself. There are an infinite number of scenarios that the text of the Bill of Rights may or may not "suggest." But this view shields the government from its burden under the *Bruen* test ultimately identify a national tradition for its restrictions.  See e.g., *Srour v. New York City, New York*, 699 F. Supp. 3d 258, 274–75 (S.D.N.Y. 2023), vacated in part, 117 F.4th 72 (2d Cir. 2024) (rejecting the City's arguments, which "impermissibly merge a person's conduct with their status as defined by the regulation").

19

The 90-day waiting period and the purchase authorization requirement "temporarily ban[] keeping, bearing, and carrying activity that would otherwise occur but for its proscription. If a citizen cannot take possession of a firearm then his or her right to possess a firearm or to carry it away is indeed curtailed, even if, as [the district court] claims, the curtailment is modest. However, the threshold inquiry is whether the Second Amendment covers the conduct curtailed by the Act, not a qualitative assessment of how modest the imposition on the right happens to be… That is indiscriminate dispossession, plain and simple." *Beckwith v. Frey*, No. 1:24-CV-00384-LEW, 2025 WL 486830, at *3 (D. Me. Feb. 13, 2025) (granting the plaintiffs' preliminary injunction of Maine's 7-day 'cooling off period').

"To the extent those arguments made in mitigation are relevant, they may bear on the second prong of the analysis but do not call into question whether as an initial matter the Act impairs conduct presumptively covered by the Second Amendment. Acquiring a firearm is a necessary step in the exercise of keeping and bearing a firearm. Any interpretation to the contrary requires the type of interpretative jiu jitsu that would make Kafka blush." *Beckwith*, at *3 (cleaned up).

As licensees, Mills and Sotomayor have been harmed by the 90-day rule and the purchase authorization, registration, and inspection requirement, which are an absolute bar – even if temporarily – to their right to have and bear arms.

20

### B.  One Handgun Carry (Backup Gun Rule)

The district court (again) reasoned its way out of its initial conclusion that the City's regulations "restrict conduct protected by the Second Amendment" [JA39] when finding that Appellants failed to "expressly define the specific protected conduct affected by the [backup gun rule]" [JA61].

The backup gun rule restricts arms-bearing conduct. Period. If there was no rule, Mills and Sotomayor would encounter no barrier (criminal and civil penalties) to carrying a second handgun as a backup gun on their person. By the City's enforcement of the backup gun rule, the City is restricting the manner in which Appellants possess and carry arms for self-defense.

The district court went on to inappropriately interject its own subjective opinion - concluding that Mills and Sotomayor can  sufficiently "defend themselves in the City in case of confrontation by carrying a single handgun" [JA62].

*Heller* rejected this type of subjective judicial judgment. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Heller*,

21

554 U.S. at 634.[13]  The issue is not whether a person can 'get by' under the government's version of what constitutes self-defense, but whether the regulation is consistent with our Nation's historical traditions. But, again, not a proper topic at the Rule 12(b)(6) stage.

### C.  Limiting the Number of Handguns Registered to a License

On the issue of the number of handguns that may be registered to/listed on a license, the district court erroneously merged the City's regulation into the question query: whether the regulation restricts arms-bearing conduct.

As noted above, while its motion to dismiss was *sub judice,* the City amended 38 RCNY § 5-25(d), now § 5-25(g) but the substance of the restriction remains essentially unchanged. A licensed person who has undergone the City's lengthy and rigorous licensing investigation background, been deemed to have the required "good moral character," is issued a concealed carry license, has purchased a handgun from a licensed gun dealer after successfully passing a federal and state criminal and mental health background check through NICS, is prohibited from carrying that handgun out of the store on his person for self-defense.

Not only is permission, inspection, registration and amendment of the license required to 'have' the handgun and remove it from the gun store, but permission

---

[13] Nor are Appellants required to allege they could not adequately protect themselves without the freedom to choose their own manner of self-defense [JA62].

must be sought and granted to Mills and Sotomayor, who already have two handguns listed on/registered to their carry licenses, to add a third, fourth, fifth, and so on - or to replace one of the two handguns listed on their license with a new handgun. Under § 5-25(g) "requests for additional handguns shall be evaluated in accordance with the standards set forth for a premise license," which is also tied to "compliance" with the 90-day rule. Purchasing a handgun in another state within the 90-day period is a violation of the rule.

### D. Exorbitant Licensing Fees

The district court ignored the Supreme Court's specific invitation in *Bruen* to constitutional challenges to licensing fees: "…because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 39 n. 9.

Other than Nassau County, every other county in New York State imposes a $10 licensing fee and charges no fee is charged for fingerprinting.

But here, where Appellant Holiday *is actually* foreclosed from exercising his Second Amendment rights by the City's exorbitant licensing fees, the district court

finds, at the 12(b)(6) stage, that "Plaintiffs have made no showing that the modest fees implicated here are in any sense exorbitant" [JA64].[14]

Reasoning that exorbitant licensing fees must be paid to "defray regulatory costs" is akin to a self-licking ice cream cone.[15]

While the Supreme Court made clear that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" [*Bruen*, 597 at 38 n. 9], the Supreme Court did not conduct an historical analysis of licensing schemes generally, which sprouted 100 years after the Founding Era and were rooted in the false premise that the Second Amendment was for the 'militia' and protected no 'individual right.'

The district court's interpretation of the City's licensing fees as "modest" highlights New York's elitist view of the Second Amendment [JA64]. Holliday is an "ordinary citizen" and his right to both have arms in his home, and carry them for

---

[14] The court's reliance on *Kwong v. Bloomberg*, 723 F.3d 160, 165-169 (2d Cir. 2013) is misplaced because, as a pre-*Bruen* decision, this Court did not apply the requisite text, history, and tradition analysis.

[15] In New York, all transfers (barring close relatives) must be conducted through an FFL and no transfer may take place unless a NICS background check is performed. NYS G.B.L. § 898. "Licensing" in the first instance, but also permission, amendments, registration, inspection – all amount to a substantial amount of bureaucratic red tape that accomplish nothing. The erection of hurdles and barriers is designed to accomplish one thing: discouragement. Neither New York State nor the City have produced any statistics that demonstrate a connection between licensing and a reduction in crime generally or crimes involving firearms specifically. The City cannot justify its exorbitant fees by pointing to self-imposed mountains of administrative paperwork and regulations. Remove the licensing requirement, or at least the 'incessant back-and-forth' for licensees, both of which are unnecessary redundancies [see, G.B.L. § 898] and the City's "regulatory costs" will shrink.

24

self-protection, has been "denied" by the City's exorbitant fees. *Bruen*, 597 U.S. at 38, n. 9 (inviting challenges to "exorbitant fees" that "deny ordinary citizens their right to public carry").

No other preexisting and fundamental right requires the payment of a fee before it can be exercised. See e.g., *Heller*, 554 U.S. 592 ("the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right").

As with Mills and Sotomayor, Holliday has sufficiently alleged that the imposition of the City's fees restricts his ability to possess arms, thus satisfying the threshold inquiry under *Bruen* [JA17-18].

## III. THE COMPLAINT ALLEGES AN INJURY-IN-FACT TRACEABLE TO THE PURCHASE AUTHORIZATION, REGISTRATION, AND INSPECTION RULES

The district court's conclusion that Appellants "failed to allege any cognizable injury traceable to the purchase authorization rule" [JA49] was also reached in error. The City's regulations restrict Appellants' right to possess and carry arms – conduct "arguably affected with a constitutional interest but proscribed by statute." See, e.g., *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015).

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. The injury-in fact requirement helps to ensure that the plaintiff has a personal stake in

the outcome of the controversy. Accordingly, an injury sufficient to satisfy Article III must be concrete and particularized, and actual or imminent, not conjectural or hypothetical. *Antonyuk v. James*, 120 F.4th 941, 976 (2d Cir. 2024).

Where a defendant makes a "facial" Rule 12(b)(1) motion challenging the plaintiff's standing to sue, the plaintiff has no evidentiary burden, and the task of the district court is to determine whether the complaint alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue. *Carter v. HealthPort Techs.*, LLC, 822 F.3d 47, 56 (2d Cir. 2016); *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (same for ripeness challenge under Rule 12(b)(1)).

Imposing criminal and civil penalties on conduct implicating the possession and/or carriage of handguns establishes an injury-in-fact. See e.g., *Emilee Carpenter, LLC v. James*, 575 F. Supp. 3d 353, 367 (W.D.N.Y. 2021), aff'd in part, vacated in part, rev'd in part, 107 F.4th 92 (2d Cir. 2024) (finding that the plaintiff's First Amendment rights were implicated where she "operates her business in part to act out her religious beliefs, and in doing so she creates photographs and blog posts that seek to celebrate God and her views on marriage").

The district court acknowledged that Mills "alleges…some prior injury" associated with the "lost time incurred" by the unavailability of the purchase authorization form, but ignored Mills' remaining allegations.

Mills and Sotomayor are vetted City licensees who have purchased handguns in the past and intend to purchase additional handguns in the future for the purpose of possessing (keep) and carrying (bear) them [JA19, 21].

The City's rules prevent people who have passed a federal and state criminal and mental health background check through NICS at the point of purchase and purchased a handgun, like Mills and Sotomayor, from having and carrying that handgun for self-protection – and FFLs from transferring handguns to such people until the License Division gets around to approving, inspecting, registering, and issuing an amended license listing the handgun on the back of the license.

The City's rules have unquestionably restricted conduct protected by the Second Amendment by preventing Mills and Sotomayor from taking possession of the firearms they purchased to 'keep and bear.' The length of an actual deprivation does not negate the existence of an injury-in-fact.

The district court improperly excused the City's restriction ("the purchase authorization rule…essentially obliges N.Y.P.D. to automatically issue purchase authorizations to licensees") and reverted to an antiquated "no ban, no foul" standard of review ("Mills and Sotomayor…were [ultimately] able to purchase guns…") [JA49-50].

Nor are Appellants required to show that they were "deterred" from applying for a license or that the N.Y.P.D. refused to issue a purchase authorization" [JA50].

27

The harm occurs at the point of purchase – when Mills and Sotomayor are prevented from acquiring arms purchased and intended to be used for self-defense. By criminalizing transfer of a handgun to a purchaser until multiple administrative steps are taken, forms submitted, permission granted, inspection held, registration added, amendment conducted, and amended license issued, the City imposes an **absolute ban** – even if temporary – on acquiring arms. The People, including Mills and Sotomayor, are conclusively prevented from acquiring the firearm they purchased to 'keep and bear.' Mills and Sotomayor suffered an injury-in-fact by the enforcement of the rules against them during their past handgun purchases; the *extent* of their harm is immaterial to Article III standing.

The complaint also sufficiently alleges that Mills and Sotomayor will continue to be, "injured by the consequent inability to exercise [their] Second Amendment rights" an "injury [that] is traceable to the defendants' enforcement of these provisions" [*Antonyuk v. James*, 120 F.4th 941, 977 (2d Cir. 2024)] – the post-purchase authorization, registration, and inspection requirements.[16]

The district court failed to take the allegations in the complaint as true when concluding that Mills and Sotomayor have not established that they are "likely to be harmed again in the future in a similar way" and therefore, lacked "standing to seek

---

[16] Acknowledging – yet dismissing - "the lost time" incurred by Mills when the purchase authorization form was unavailable online, the district court highlights its reluctance to acknowledge that a restriction of a constitutional right constitutes an injury-in-fact [JA50].

injunctive relief" [JA50]. The purchase authorization, registration, and inspection rules have not been repealed; Mills and Sotomayor remain subject to their enforcement every time they purchase a handgun. Likewise, a plaintiff is not required to allege that they "were permanently deprived of their right to keep and bear arms" to have standing to challenge a government's firearm regulations [JA50].

Moreover, Appellants' challenge to these rules are not "generalized grievances" [JA50]. As licensees who have purchased, and intend to continue, purchasing handguns under their City license, Mills and Sotomayor have established Article III standing.

Each regulation challenged in the federal complaint restricts arms-keeping and arms-bearing conduct. If the City's rules did not exist and Appellants lived in in a free society – like the people living in the 28 constitutional carry states – Mills, Sotomayor, and Holliday would be able to freely purchase, acquire, keep and carry arms to protect themselves in the manner of their personal choosing - and this case would not have been brought. The theories poured out by the district court, however, bear no resemblance to the text, history, and tradition analysis applied by the Supreme Court from *Heller* through *Rahimi*. To the contrary, they more accurately reflect the pre-*Bruen* 'balancing acts' rejected in *Bruen*. Reversal is not only warranted, it is required.

29

The complaint also established traceability to the City. The NYPD License Division enforces the City's firearms regulations under 38 RCNY and the challenged NYC Admin. Code sections, which includes investigating, charging, and filing criminal complaints against violators, and suspending/revoking firearm licenses. The City regulations challenged by Appellants are not moribund and, by their plain language, are reasonably read to prohibit conduct protected by the Second Amendment. Under the circumstances, it is fair to presume an intent by the City to enforce the law against violators.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand with instructions to grant Appellants leave to amend the complaint to reflect the City's amendment to 38 RCNY § 5-25.

Dated: March 24, 2025

Respectfully submitted,

*Amy Bellantoni*
Amy L. Bellantoni
*Attorneys for Appellants*
The Bellantoni Law Firm, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
abell@bellantoni-law.com

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). It contains 6,740 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.


Dated:   March 24, 2025