# 24-3308-cv

# United States Court of Appeals
## for the
## Second Circuit

CHARLES MILLS, CRAIG SOTOMAYOR, BRADEN HOLLIDAY,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (New York City)

———————————————————————

# JOINT APPENDIX

———————————————————————

**THE BELLANTONI LAW FIRM**
*Attorneys for Plaintiffs-Appellants*
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090
info@bellantoni-law.com

# JA1

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:23-cv-07460-JSR

Mills et al v. New York City, New York

Assigned to: Judge Jed S. Rakoff

Cause: 42:1983 Civil Rights Act

Date Filed: 08/23/2023

Date Terminated: 12/05/2024

Jury Demand: None

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Charles Mills**　　　　　　　　　　　　represented by　**Amy L Bellantoni**
The Bellantoni Law Firm, LLP
2 Overhill Road
Suite 400
Scarsdale, NY 10583
914-367-0090
Fax: 888-763-9761
Email: abell@bellantoni-law.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Craig Sotomayor**　　　　　　　　　　　represented by　**Amy L Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Braden Holliday**　　　　　　　　　　　represented by　**Amy L Bellantoni**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**New York City, New York**　　　　　　represented by　**Nicholas Robert Ciappetta**
New York City Law Department
Administrative Law and Regulatory
Litigation Division
100 Church Street
New York, NY 10003
212-256-4036
Email: nciappet@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 08/23/2023 | 1 | COMPLAINT against New York City, New York. (Filing Fee $ 402.00, Receipt Number ANYSDC-28186879)Document filed by Charles Mills, Braden Holliday, Craig Sotomayor..(Bellantoni, Amy) (Entered: 08/23/2023) |
|---|---|---|
| 08/23/2023 | 2 | **FILING ERROR - DEFICIENT PLEADING - SUMMONS REQUEST PDF ERROR - REQUEST FOR ISSUANCE OF SUMMONS** as to New York City, New York, re: 1 Complaint. Document filed by Braden Holliday, Charles Mills, Craig Sotomayor.. (Bellantoni, Amy) Modified on 8/24/2023 (pc). (Entered: 08/23/2023) |
| 08/23/2023 | 3 | CIVIL COVER SHEET filed..(Bellantoni, Amy) (Entered: 08/23/2023) |
| 08/24/2023 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Paul A. Crotty. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 08/24/2023) |
| 08/24/2023 | | Magistrate Judge Ona T. Wang is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 08/24/2023) |
| 08/24/2023 | | Case Designated ECF. (pc) (Entered: 08/24/2023) |
| 08/24/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Amy L Bellantoni to RE-FILE Document No. 2 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; Only parties on the complaint caption title can be issued a summons. Re-file the document using the event type Request for Issuance of Summons found under the event list Service of Process - select the correct filer/filers - and attach the correct summons form PDF. (pc) (Entered: 08/24/2023)** |
| 08/24/2023 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to New York City, New York, re: 1 Complaint. Document filed by Braden Holliday, Charles Mills, Craig Sotomayor.. (Bellantoni, Amy) (Entered: 08/24/2023) |
| 08/25/2023 | 5 | ELECTRONIC SUMMONS ISSUED as to New York City, New York..(pc) (Entered: 08/25/2023) |
| 09/01/2023 | 6 | AFFIDAVIT OF SERVICE of Summons and Complaint. New York City, New York served on 8/31/2023, answer due 9/21/2023. Service was accepted by Sarah Jean-Charles, Docketing Agent. Document filed by Charles Mills; Braden Holliday; Craig Sotomayor.. (Bellantoni, Amy) (Entered: 09/01/2023) |
| 09/01/2023 | 7 | AFFIDAVIT OF SERVICE of Summons and Complaint. New York City, New York served on 9/1/2023, answer due 9/22/2023. Service was made by serviceecf@law.nyc.gov. Document filed by Charles Mills; Braden Holliday; Craig Sotomayor..(Bellantoni, Amy) (Entered: 09/01/2023) |
| 09/18/2023 | 8 | NOTICE OF APPEARANCE by Nicholas Robert Ciappetta on behalf of New York City, New York..(Ciappetta, Nicholas) (Entered: 09/18/2023) |
| 09/18/2023 | 9 | FIRST LETTER MOTION for Extension of Time to File Answer re: 1 Complaint addressed to Judge Paul A. Crotty from Nicholas R. Ciappetta dated September 18, 2023. |

| | | |
|---|---|---|
| | | Document filed by New York City, New York..(Ciappetta, Nicholas) (Entered: 09/18/2023) |
| 09/18/2023 | 10 | ORDER granting 9 Motion for Extension of Time to Answer. The time to move or otherwise respond to the complaint is extended to October 13, 2023. SO ORDERED. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 09/18/2023) |
| 10/13/2023 | 11 | LETTER MOTION for Conference re: 1 Complaint *Request for Pre-Motion Conference* addressed to Judge Paul A. Crotty from Nicholas Ciappetta dated October 13, 2023. Document filed by New York City, New York..(Ciappetta, Nicholas) (Entered: 10/13/2023) |
| 10/16/2023 | | Notice of Pre-Motion Conference: A Pre-Motion Conference is scheduled to go forward on: Tuesday, October 31, 2023 @ 12:00 noon, via teleconference before Judge Paul A. Crotty, U.S.D.J. Dial-in: 888-363-4749. Access: 8539662. If the date is not convenient, either party can e-mail three (3) mutually convenient dates to the Courtroom Deputy at: David_C_Gonzalez@nysd.uscourts.gov ----- A PDF IS NOT ATTACHED TO THIS ENTRY ----- (By: David Gonzalez - Courtroom Deputy).(dgo) (Entered: 10/16/2023) |
| 10/31/2023 | 12 | LETTER RESPONSE to Motion addressed to Judge Paul A. Crotty from Amy L. Bellantoni dated October 30, 2023 re: 11 LETTER MOTION for Conference re: 1 Complaint *Request for Pre-Motion Conference* addressed to Judge Paul A. Crotty from Nicholas Ciappetta dated October 13, 2023. . Document filed by Braden Holliday, Charles Mills, Craig Sotomayor..(Bellantoni, Amy) (Entered: 10/31/2023) |
| 10/31/2023 | | Minute Entry for proceedings held before Judge Paul A. Crotty: Pre-Motion Conference held on 10/31/2023. REMARK: Counsel for both sides appeared. The Court set the following MTD schedule: Motion due by December 8, 2023. Response January 8, 2024. Reply January 22, 2024. The request to file cross motions for summary judgment is deferred until the outcome of the MTD. See transcript for details. (Court Reporter Sadie Herbert) (dgo) (Entered: 10/31/2023) |
| 12/08/2023 | 13 | MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6)*. Document filed by New York City, New York. Responses due by 1/8/2024 Return Date set for 1/22/2024 at 05:00 PM..(Ciappetta, Nicholas) (Entered: 12/08/2023) |
| 12/08/2023 | 14 | DECLARATION of Nicholas R. Ciappetta in Support re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6)*.. Document filed by New York City, New York. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2). (Ciappetta, Nicholas) (Entered: 12/08/2023) |
| 12/08/2023 | 15 | MEMORANDUM OF LAW in Support re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6)*. . Document filed by New York City, New York..(Ciappetta, Nicholas) (Entered: 12/08/2023) |
| 12/12/2023 | | DOCKET ANNOTATION: In light of the recent rulings from the Second Circuit in Antonyuk et al v. Chiumento et al and Gazzola v. Hochul, the Defendant is directed to submit a status letter advising how the rulings effect their motion. Letter due by December 19, 2023.(dgo) (Entered: 12/12/2023) |
| 12/19/2023 | 16 | STATUS REPORT. *Defendant's Status Report on Antonyuk and Gazzola* Document filed by New York City, New York..(Ciappetta, Nicholas) (Entered: 12/19/2023) |
| 01/03/2024 | 17 | CONSENT LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Paul A. Crotty from Amy L. Bellantoni dated January 3, 2024. Document filed by Braden Holliday, Charles Mills, Craig Sotomayor..(Bellantoni, Amy) (Entered: 01/03/2024) |
| 01/04/2024 | 18 | ORDER granting 17 Motion for Extension of Time to File Response/Reply. The requested extensions for the opposition and reply are granted. SO ORDERED. (HEREBY |

| | | |
|---|---|---|
| | | ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 01/04/2024) |
| 01/22/2024 | 19 | MEMORANDUM OF LAW in Opposition re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6)*. . Document filed by Braden Holliday, Charles Mills, Craig Sotomayor..(Bellantoni, Amy) (Entered: 01/22/2024) |
| 02/01/2024 | 20 | FIRST LETTER MOTION for Extension of Time to File Response/Reply as to 19 Memorandum of Law in Opposition to Motion addressed to Judge Paul A. Crotty from Nicholas Ciappetta dated February 1, 2024. Document filed by New York City, New York.. (Ciappetta, Nicholas) (Entered: 02/01/2024) |
| 02/02/2024 | 21 | ORDER granting 20 Letter Motion for Extension of Time to File Response/Reply re 20 FIRST LETTER MOTION for Extension of Time to File Response/Reply as to 19 Memorandum of Law in Opposition to Motion addressed to Judge Paul A. Crotty from Nicholas Ciappetta dated February 1, 2024. The requested extension is GRANTED. SO ORDERED. (Signed by Judge Paul A. Crotty on 2/2/2024) Replies due by 2/19/2024. (ks) (Entered: 02/02/2024) |
| 02/16/2024 | 22 | LETTER addressed to Judge Paul A. Crotty from Amy L. Bellantoni dated February 16, 2024 re: historical evidence of the definition of "abridge" and "infringe" in the FoundingEra. Document filed by Braden Holliday, Charles Mills, Craig Sotomayor. (Attachments: # 1 Exhibit 1806 A Compendious Dictionary of the English Language (excerpts), Noah Webster).(Bellantoni, Amy) (Entered: 02/16/2024) |
| 02/20/2024 | 23 | REPLY MEMORANDUM OF LAW in Support re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6)*. . Document filed by New York City, New York..(Ciappetta, Nicholas) (Entered: 02/20/2024) |
| 04/15/2024 | | NOTICE OF CASE REASSIGNMENT to Judge Jed S. Rakoff. Judge Paul A. Crotty is no longer assigned to the case. (sgz) (Entered: 04/15/2024) |
| 04/22/2024 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Oral Argument set for 6/7/2024 at 11:00 AM before Judge Jed S. Rakoff. (nmo) (Entered: 04/22/2024) |
| 06/03/2024 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: The Oral Argument set for June 7,2024 is cancelled. The motion will be decided on the submissions (Kotowski, Linda) (Entered: 06/05/2024) |
| 08/16/2024 | 24 | RESPONSE re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6). following the decision in United States v. Rahimi*. Document filed by Braden Holliday, Charles Mills, Craig Sotomayor..(Bellantoni, Amy) (Entered: 08/16/2024) |
| 08/16/2024 | 25 | RESPONSE in Support of Motion re: 13 MOTION to Dismiss *Complaint Pursuant to Federal Rules of Civil Procedures 12(b)(1) and 12(b)(6). Supplemental Submission by the City of New York*. Document filed by New York City, New York. (Attachments: # 1 Exhibit A).(Ciappetta, Nicholas) (Entered: 08/16/2024) |
| 09/25/2024 | 26 | ORDER granting 13 Motion to Dismiss. Before the Court is the opposed motion of defendant New York City to dismiss the complaint in the above-captioned case (ECF No. 13). The Court invited the parties to provide supplemental briefing in light of the Supreme Court's intervening decision in United States v. Rahimi, 144 S. Ct. 1889 (2024), and they did so (ECF Nos. 24, 25). After careful consideration, the Court grants defendant's motion to dismiss in full. A memorandum explaining the reasons for this ruling will issue in due course, at which time final judgment will be entered. SO ORDERED.. (Signed by Judge Judge Jed S. Rakoff on 9/25/2024) (ks) Modified on 11/8/2024 (ks). (Entered: 09/25/2024) |

## JA5

| | | |
|---|---|---|
| 12/04/2024 | 27 | OPINION AND ORDER: For the foregoing reasons, the Court hereby dismisses plaintiffs' complaint in full with prejudice. Clerk to enter judgment. SO ORDERED. (Signed by Judge Jed S. Rakoff on 12/4/2024) (ks) Transmission to Orders and Judgments Clerk for processing. (Entered: 12/04/2024) |
| 12/05/2024 | 28 | CLERK'S JUDGMENT re: 27 Memorandum & Opinion in favor of New York City, New York against Braden Holliday, Charles Mills, Craig Sotomayor. It is hereby ORDERED, ADJUDGED AND DECREED: That for the forgoing reasons stated in the Court's Opinion and Order dated December 4, 2024, the Court hereby dismisses plaintiffs' complaint in full with prejudice. (Signed by Clerk of Court Tammi M Hellwig on 12/5/2024) (Attachments: # 1 Appeal Package) (tp) (Entered: 12/05/2024) |
| 12/17/2024 | 29 | NOTICE OF APPEAL from 27 Memorandum & Opinion, 28 Clerk's Judgment,. Document filed by Charles Mills, Craig Sotomayor, Braden Holliday. Filing fee $ 605.00, receipt number ANYSDC-30346690. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Bellantoni, Amy) Modified on 12/17/2024 (nd). (Entered: 12/17/2024) |
| 12/17/2024 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 29 Notice of Appeal,..(nd) (Entered: 12/17/2024) |
| 12/17/2024 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 29 Notice of Appeal, filed by Craig Sotomayor, Braden Holliday, Charles Mills were transmitted to the U.S. Court of Appeals..(nd) (Entered: 12/17/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/06/2025 17:03:12 | | | |
| **PACER Login:** | Amybellantoni | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-07460-JSR |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**JA6**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CHARLES MILLS, CRAIG SOTOMAYOR, and
BRADEN HOLLIDAY,

                                  Plaintiffs,                  Case No.: 23 Civ. 7460 (PAC)(OTW)

                -against-

NEW YORK CITY, New York,                **COMPLAINT**

                                 Defendant.
------------------------------------------------------------------x

        Plaintiffs, CHARLES MILLS, CRAIG SOTOMAYOR, and BRADEN HOLLIDAY, by

and through their attorneys The Bellantoni Law Firm, PLLC, for their Complaint respectfully state:

### NATURE OF THE ACTION

        1.      This is an action for declaratory, injunctive, and other relief, to include presumed

nominal damages, compensatory damages, costs, disbursements, and reasonable statutory

attorney's fees pursuant to 42 U.S.C. § 1988, for continuing irreparable harm to the plaintiffs

arising from violations to their constitutional rights as codified in and protected under the Second

and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.

### JURISDICTION AND VENUE

        2.      Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1331 in that this action

arises under the United States Constitution and laws of the United States, and under 28 U.S.C. §

1343(a)(3) in that this action seeks to redress the deprivation, under of color of the laws, statutes,

ordinances, regulations, customs, and usages of the State of New York, of rights, privileges or

immunities secured by the United States Constitution. This action also seeks relief pursuant to 28

U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, § 1988. Venue in this district is proper pursuant to

28 U.S.C. § 1391.

# JA7

## THE PARTIES

3.      Plaintiff, Charles Mills ("Mills") is a citizen of the United States and a resident of Queens County, State of New York.

4.      Plaintiff, Craig Sotomayor ("Sotomayor") is a citizen of the United States and a resident of Nassau County, State of New York.

5.      Plaintiff, Braden Holliday ("Holliday") is a citizen of the United States and a resident of Bronx County, State of New York.

6.      Defendant, New York City, New York (the "City") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of the State.

## CONSTITUTIONAL FRAMEWORK

7.      The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

8.      The Second Amendment codifies a *preexisting* right, which means that individuals have an *inherent* right to possess and/or carry weapons in common use, including firearms[1] - the ability to engage in that conduct was not *given* to them by the government.

> "[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.
>
> The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'

___
[1] Handguns and long guns.

# JA8

As we said in *United States v. Cruikshank* …[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed..."[2]

9.    The Second Amendment right of "the people…unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, at 580.

" '[T]he people' seems to have been a term of art employed in select parts of the Constitution …. [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

*Heller*, at 580 quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990).

10.    The Fourteenth Amendment provides, in pertinent part: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV.

11.    The Second Amendment presumptively protects the preexisting right to possess and carry all weapons in common use for self-defense. *Bruen*, at 2132 ("even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense") citing, *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016) (per curiam) (stun guns).

12.    Handguns are weapons in common use for self-defense and are protected within the scope of the Second Amendment. *Heller,* at 628 (recognizing handguns to be "an entire class

---

[2] *D.C. v. Heller*, 554 U.S. 570, 592 (2008) (emphasis supplied) quoting, *United States v. Cruikshank*, 92 U.S. 542, 553 (1876) (quotation marks omitted).

# JA9

of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense].").

13.     In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court reiterated the text, history, and tradition standard of reviewing Second Amendment challenges, consistent with *Heller*, *McDonald*[3], and *Caetano*.[4]

14.     Flatly rejecting the 'interest balancing' 'intermediate scrutiny' test created by the Second Circuit (and others), the *Bruen* Court laid out a clear path to determine the constitutionality of government regulations affecting the Second Amendment: "We reiterate that the standard for applying the Second Amendment is as follows:

> "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.
>
> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, at 2126. ("In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny.") (emphasis added) (citation omitted).

15.     "But to the extent that later history contradicts what the text says, the text controls." *Bruen*, at 2137.

---

[3] *McDonald v. Chicago*, 561 U.S. 742 (2010).
[4] "But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, at 2127. See also, *Caetano*, supra.

# JA10

## MATERIAL FACTS

16.    The mere possession of a handgun in New York State is a felony punishable by incarceration, fines, and other penalties, and will cause the permanent loss of one's right to possess firearms.

17.    To lawfully purchase, possess, and/or carry a handgun in New York State requires applying for, and obtaining, a handgun license from a statutory licensing officer.

18.    The statutory licensing officer for the 5 boroughs of New York City is the New York City police commissioner[5], who delegates such authority to the NYPD License Division.[6]

19.    New York State's handgun regulations are set forth in Penal Law section 400.00, however, New York City has enacted its own rules and regulations under 38 RCNY 5 to restrict conduct protected by the Second and Fourteenth Amendments.

20.    38 RCNY 5 regulates, among other conduct, the handgun licensing process, restrictions on the purchase of handguns, the possession of handguns, and the concealed carriage of handguns.

21.    Before an individual may lawfully possess a handgun in New York City, they must create an online account through the NYPD License Division portal,[7] complete the application, which includes uploading documents to the portal[8], and submit the application by selecting the "Finalize and Submit" button. The applicant is eventually contacted for an appointment to personally appear at the License Division to be fingerprinted  and pay the required fees.

---

[5] Penal Law 265.00(17).
[6] https://www.nyc.gov/site/nypd/services/law-enforcement/permits-licenses-firearms.page
[7] https://licensing.nypdonline.org/app-instruction/
[8] https://licensing.nypdonline.org/new-app-instruction/

# JA11

*Licensing Fees*

22.     The right to possess weapons in common use, which includes handguns, is a preexisting right; individuals inherently possess that natural right to instruments of self-defense just as they possess the right to speak, worship, and breathe.

23.     The right to possess and carry weapons is not 'given' to anyone, and existed long before the existence of any form of government.

24.     The Second Amendment merely codified a preexisting right[9] – for its protection against a tyrannical government seeking to disarm the population, as England did.

25.     Any requirement that an individual pay money to the government to exercise the constitutional right to self-defense is unconstitutional.

26.     The constitutional right to keep and bear arms is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees. *Bruen*, at 2156 quoting, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010) (plurality opinion).

27.     No other constitutional right requires prior permission for its exercise.

28.     No other constitutional right requires paying the government money before may be lawfully exercised.

29.     In New York City, individuals must pay $428.50 to apply for permission to exercise a *preexisting* right: a $340 application fee and an $88.50 fingerprinting fee.[10]

30.     A New York City handgun license is required to be renewed every three (3) years, which requires another $340 to be paid.

---

[9] *Heller*, at 592.
[10] https://licensing.nypdonline.org/new-app-instruction/

# JA12

31.     Requiring that an individual pay a fee to the government before they can exercise the right to possess and/or carry weapons in common use is repugnant to the plain text of the Second Amendment and inconsistent with text, history, and tradition.

32.     New York City's licensing fee requirement should be preliminarily and permanently enjoined.

***Permission to Purchase Handguns - 38 RCNY 5-25(a)***

33.     Once (and if) a handgun license is issued, the City places a whole host of rules and restrictions on the "licensees," whose Second Amendment-protected conduct is now under the complete discretion, control, and authority of the License Division[11] by way of "Subchapter B: Licensee Responsibilities."

34.     38 RCNY 5-25(a) prohibits a licensee from purchasing a handgun without first seeking and obtaining permission from the NYPD by way of a "Handgun Purchase Authorization" form ("Authorization form").[12]

35.     38 RCNY 5-22(9) provides, a licensee "shall not purchase or replace a handgun prior to obtaining written permission from the Division Head, License Division (see Handgun Purchase Authorizations)."

36.     Under 38 RCNY 5-25(a) and (c), licensees must seek and obtain permission from the government before they may purchase/acquire an additional handgun.

37.     The government will grant or deny permission as it so determines.

38.     Before purchasing a new firearm, licensees must complete the License Division's 'Purchase Authorization Form' ("PA Form") and bring the form to their gun store of choice. After

---

[11] https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCrules/0-0-0-77275
[12] A requirement notwithstanding 5-25(d)(1), which mandates "all licensees shall utilize a safe when handguns are stored out of their possession at a premises."

**JA13**

purchasing a new firearm, the gun store will provide the licensee with a Bill of Sale and will input the NICS (National Instant Criminal Background Check) number on the PA Form.

39. The licensee cannot take possession of his/her firearm upon payment to the gun store and passing a NICS background check.

40. Instead, within 72 hours of the purchase, the licensee must email the License Division the following documents along with his/her request to add the newly purchased firearm:[13]

- Completed "Purchase Authorization Request Form";

- Receipt/Bill of Sale for the firearm purchased;

- A minimum of two (2) color photographs of the firearm that was purchased (the first photograph must display the entirety of the firearm with accurate color representation, and the second photograph must legibly capture the firearm's serial number);

- Proof of ownership of safe storage consisting of a Bill of Sale and two (2) color photos of the safe storage, depicting both the interior and exterior of the safe/container. Photos may not be stock images and must depict the entirety of the safe/container, not merely a portion thereof.

41. Failure to return the documents within the specified time (72 hours) <u>shall</u> result in the suspension and/or revocation of the handgun license(s). 38 RCNY 5-25(c)(5).

42. Once the above items are received by the License Division, and if the purchase is approved, an amended license reflecting the newly purchase firearm and a Purchase Authorization (pink slip) is mailed to the licensee via United States Postal Service (U.S.P.S.) to the mailing address on record with the License Division.

---

[13] And the text of 38 RCNY 5-25 requires, *inter alia*, in person inspection of the newly purchased firearm.

# JA14

43.    The Purchase Authorization and amended license are required for a licensee to take possession of their previously purchased firearm from the gun store.

44.    The License Division asks licensees to allow fourteen (14) business days to receive the Purchase Authorization and amended license.

***Government Registration of Handguns***

45.    38 RCNY 5-22(8) provides that a licensee is only authorized to own the handgun(s) that are listed on (registered to) their license.

46.    Firearm registration requirements are inconsistent with the plain text of the Second Amendment, and this Nation's history and tradition of firearm regulation. There is no historical analogue for such restrictions.

***Government Restriction on Number of Handguns One May Own and/or Register on License***

47.    Through 38 RCNY 5-25(d) entitled "Number of Handguns Allowed on a Handgun License", the government controls the number of handguns a licensee has permission to own – and the City requires licensees to have separate licenses – and separate handguns listed thereon - for possessing in their residence and for carrying concealed in public.

48.    A licensee with both a premise license and a carry license cannot register the same handgun on both licenses.

49.    38 RCNY 5-25(d)(4) proscribes the number of handguns the government will allow to be registered on a particular handgun license: Concealed carry licenses are limited to two (2) handguns.[14] Residence licenses are limited to one (1)[15], unless and until the government gives permission to purchase another handgun, but permission will be granted only if the licensee can

---

[14] Section 5-25(d)(4)(i).
[15] Section 5-25(d)(4)(vi).

# JA15

prove to the government's satisfaction "evidence of appropriate safeguarding" and if the licensee "establishes compliance with the mandatory waiting periods pursuant to subdivision (b) of § 10-302.1 of the Administrative Code and § 400.20 of the Penal Law."

50.    Permission and discretion are required for every purchase, disposition, and/or transfer of a handgun – even where the licensee seeks to transfer a handgun from one license to the other.

51.    Take for example a New York City resident and licensee who owns five (5) handguns. He is only allowed to 'register' two (2) of them to his carry license, with the make, model, serial number, and caliber of each handgun displayed on the back of such carry license. The remaining three (3) handguns are required to be 'registered' and displayed on the back of his residence (premises) license in a similar fashion.

52.    A licensee *is absolutely prohibited from* publicly carrying *any* of the three (3) lawfully owned handguns 'registered to' a residence (premises) license.  If that licensee publicly carries any one of the three 'home' handguns, he will be guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and his license will be suspended and/or revoked.

53.    Under section 5-25(d)(4)(iv), which restricts the number of handguns on a residence license, a licensee may ask permission to have additional handguns for home protection, which "shall be reviewed on an individual basis."

54.    But under section 5-25(d)(4)(i), which restricts Carry and Special Carry licenses to two (2) handguns, the Division Head of the License Division "may, in their discretion [*further*] limit the number of handguns that appear on the carry handgun license." Meaning that the government has discretion to limit a carry licensee to one specifically registered handgun.

# JA16

***Government Restriction on Number of Handguns Purchased Within 90 Days***

55.     If permission to purchase is granted to the licensee, and the licensee clears all the hurdles to obtaining such permission, the licensee is prohibited from purchasing more than one (1) firearm within a 90-day time period. See, NYC Admin. Code 10-302.1.

56.      NYC Admin. Code 10-302.1(a) prohibits gun shops from (i) transferring and/or selling a firearm to any individual who has received/purchased a firearm within the past 90-days and (ii) from transferring/selling more than one (1) firearm to any individual as part of the same transaction.

57.     Under NYC Admin. Code 10-302.1(b), licensees (i) cannot purchase more than one (1) firearm (handgun, rifle, or shotgun) as part of the same sales transaction; and (ii) cannot purchase more than one (1) firearm during a 90-day time period.

58.     Transferring one's handgun from a premise license to a carry license starts the 90-day clock running as well.

59.     The 90-day clock for handgun purchases and transfers is separate and apart from the 90-day clock for purchases and transfers of rifles and shotguns.

60.     Violations of the 90-day waiting period constitute misdemeanor crimes punishable by one (1) year in jail and a fine of up to $1,000[16], license revocation for the licensee and the gun shop, and the automatic forfeiture and destruction of the firearms involved.[17] No NYC gun store will violate the 90-day restriction.

61.     A licensee who violates this regulation is also guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and license revocation.

---

[16] See, 10-310.
[17] See, 10-302.1(h)(i).

# JA17

62.     NYC Admin. Code 10-302.1(f) exempts from the 90-day waiting period individuals who also happen to be employed as law enforcement officers and/or peace officers - who have no limitation on the number of handguns, rifles, and shotguns they can purchase, receive, and/or transfer[18] for their personal use.

### Government Restriction on Number of Handguns Carried – Backup Handgun Ban

63.     Section 5-22(a)(7) restricts licensees holding a "Carry" or "Special Carry" type license to carrying only one (1) handgun on their person at any time. A licensee who violates this regulation is guilty of a Class A Misdemeanor under Penal Law § 400.00(15), (17), which is punishable by one (1) year in jail, 3 years of probationary supervision, and/or a fine of $1,000, and his license will be suspended and/or revoked.

### Plaintiff Braden Holliday

64.     Braden Holliday, age 31, is an African American man and a resident of the Bronx. Mr. Holliday has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

65.     If Mr. Holliday applied to the NYPD License Division for a license to possess and/or carry firearms, he would be approved.

66.     Mr. Holliday attempted to obtain a handgun license by going onto the NYPD License Division website and reviewing the instructions for obtaining firearm licenses.

67.     But Mr. Holliday learned that the licensing fee would cost him over $400, he stopped the application process because applying would be futile.

---

[18] The statute also exempts, *inter alia*, motion picture, television and video production companies, public agencies "in furtherance of official business."

# JA18

68.     Mr. Holliday cannot obtain a firearm license because he cannot afford the cost of the application and fingerprinting fees, nor can he afford the cost of renewing the license every three years.

69.     Defendant's fee requirement is an absolute bar to the exercise of Mr. Holliday's Second and Fourteenth Amendment rights.

70.     If there was no fee for a firearm license, Mr. Holliday would have already submitted his application and been granted a firearm license. [19]

71.     It is a violation of Mr. Holliday's Second and Fourteenth Amendment rights for the City to require him to pay a fee to exercise a preexisting constitutional right.

72.     Analogous to the Fourteenth Amendment violations resulting from state-imposed poll taxes [see, *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 666 (1966) (holding "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard")], imposing a fee to exercise the rights protected under the Second Amendment is patently unconstitutional and must also be enjoined.

73.     Notably, the *Harper* Court did not try to justify the *amount* of the fee, but the very fact that there was a fee in the first instance. See, *Harper*, at 668 ("We say the same whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it. The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote or who fail to pay.").

---

[19] See, Penal Law § 400.00(14), which caps the licensing fee for every county except Nassau County and New York City at $10 and does not authorize any licensing officer to collect a fee for fingerprinting.

# JA19

74.     Particularly troubling is the fact that the states' gun regulations were motivated by, and originated from, racial animus and were intended to prevent freed slaves from possessing firearms.

75.     Judge Kozinski observed in *Silveira v. Lockyer*, 328 F.3d 567, 568 (9th Cir. 2003) (Kozinski, dissenting from denial of rehearing en banc) our Nation's history reveals that "tyranny thrives best where government need not fear the wrath of an armed people:

> Disarmament was the tool of choice for subjugating both slaves and free blacks in the South. In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process. See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro–Americanist Reconsideration, 80 Geo. L.J. 309, 338 (1991). In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence. *Id.* at 341–42.
>
> As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to resist. See *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms ***wherever they went***"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble." (emphasis added).

76.     If the government requires individuals to seek permission before they can exercise a ***preexisting*** right – an oxymoron in itself – then  the government must bear the cost.

### Plaintiff Charles Mills

77.     Charles Mills is a resident of Queens County. Mr. Mills has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

78.     Mr. Mills holds two (2) separate New York City handgun licenses, as required by the City's regulations – one license that authorizes him to purchase, own, and possess handguns in

## JA20

his home for protection ("Premise License"); and a second license that authorizes him to purchase, own, and carry a handgun concealed on his person ("Carry License").

79.     The application processing time for Mr. Mills to attain permission to obtain and possess handguns in his home (by way of a Premise License) was approximately 17 months.

80.     Mr. Mills also holds a New York City Rifle/Shotgun License.

81.     Every handgun that Mr. Mills owns is required to be registered to one of his licenses, and on the back of each license is listed those handguns that are registered thereto.

82.     Only two (2) of the handguns owned by Mr. Mills (and therefore registered to his Premise License) can be registered to his Carry License.

83.     Mr. Mills is prohibited from registering more than 2 handguns to his Carry License. And he may only carry those two (2) handguns in public.

84.     If Mr. Mills carries <u>ANY</u> of the other handguns registered to his Premise License, his license will be revoked, and he will be guilty of a Class A Misdemeanor as described above.

85.     Mr. Mills has tried to purchase/transfer/receive more than one firearm at a time but is prohibited by New York City's regulations from purchasing more than one firearm at a time. Every gun shop in New York City is statutorily prohibited from selling anyone, including Mr. Mills, more than one handgun at a time and every gun shop that Mr. Mills has spoken with complies with the 90-day restriction.

86.     When Mr. Mills was issued his Carry License, he attempted to transfer two (2) of the handguns registered to his Premise License onto his Carry License but was forced to add one and then wait 90 days to add the second.

# JA21

87.   After adding the second handgun to his Carry License, Mr. Mills was forced to wait another 90 days to purchase a new handgun, which required a repeat of the same lengthy permission process.

88.   Mr. Mills has purchased handguns in the past and intends to purchase additional handguns in the future.

89.   Specifically, Mr. Mills has definite plans to purchase a Glock 21 from Woodhaven Rifle & Pistol and would already have purchased the handgun but is barred from purchasing it because (i) he was required to wait 90 days from the last time that he 'received' a handgun - when he transferred his Glock 19 from his Premise License to his Carry License; and (ii) until this week he has been unable to reach anyone in the License Division to obtain a Purchase Authorization Form, which are not available to download from the website.

90.   Under the City's regulations, the transfer of Mr. Mills' Glock 19 from his Premise License to his Carry License triggered the 90-day waiting period for any other transfers/purchases. On June 23, 2023, Mr. Mills was required to wait 6 more weeks to begin the purchase/permission process with the government, and he will be required to wait 90 more days after each future purchase.

91.   Even if Mr. Mills purchased a handgun outside of New York City from a gun store not bound by the City's 90-day restrictions, Mr. Mills would be guilty of a crime under New York City's regulations as detailed above, would be unable to register the new handgun on his licenses, and would have his handgun licenses revoked for failure to abide by the City's rules.

92.   Like just about every other handgun owner, Mr. Mills intends to decide for himself which of his handguns to carry on any particular day, and to then carry it for self-defense, and objects to being required to seek and obtain permission from a government employee.

**JA22**

93.     But Mr. Mills cannot make such use of his property because he is restricted to choosing from only two (2) handguns and is prohibited from carrying any of the remaining handguns on his Premise License.

94.     Mr. Mills also intends to carry one of his handguns as a primary weapon and a second handgun as a back-up.

95.     Mr. Mills is prohibited from carrying more than one handgun at a time under 38 RCNY 5-22(7). Violation of this regulation subjects Mr. Mills to criminal penalties, revocation of all three (3) of his licenses, and mandatory statutory forfeiture of his firearms.

96.     Mr. Mills would carry a backup handgun on a regular basis but for the fact that carrying more than one handgun at a time is a crime in New York City – even for licensees.

97.     The NYPD will arrest Mr. Mills for carrying more than one of the handguns registered to his Carry License at the same time, and the License Division will revoke Mr. Mills' Premise, Carry, and Rifle/Shotgun Licenses for violating the government's rules.

98.     The restrictions to Mr. Mills' exercise of the rights protected by the Second and Fourteenth Amendments described herein are repugnant to the plain text of the Second Amendment and should be permanently enjoined.

### Plaintiff Craig Sotomayor

99.     Craig Sotomayor, age 23, is a Hispanic male and resident of Nassau County, which is located outside of New York City. Mr. Sotomayor has no prohibitors to the possession of firearms and is one of "the People" for whom the Second Amendment was written.

100.     Mr. Sotomayor holds an unrestricted (full carry) New York State concealed carry handgun license issued by the statutory licensing officer for Nassau County.

# JA23

101.    Because NYS handgun licenses that are issued outside of the City are invalid inside of the City[20], Mr. Sotomayor was required to apply for and obtain a NYC Special Carry License, which he did.[21] Mr. Sotomayor also holds a NYC Rifle/Shotgun License.

102.    Mr. Sotomayor has an impressive and sizeable handgun collection of revolvers and semi-automatic pistols that vary in model type, caliber, and size. Each of his firearms is registered to his New York State license.

103.    Mr. Sotomayor carries a handgun on a regular basis for self-defense, and many times he carries a backup. Mr. Sotomayor's choice of which handgun(s) to wear depends on a number of factors, from size, caliber, weather, clothing, where he will be traveling to and the activities he will be engaged in.

104.    Under the City's restrictions, Mr. Sotomayor was forced to choose two handguns from his collection to register to his Special Carry License. Though vetted and licensed, if Mr. Sotomayor carries any of his lawfully owned handguns other than the two specifically registered to his Special Carry License, he will be guilty of a crime, arrested, incarcerated, prosecuted, his Special Carry License will be revoked, and he will be forced to forfeit not only the handgun he was wearing but also the two handguns on his Special Carry License, as detailed in the regulations above.

105.    Mr. Sotomayor has carried a backup handgun during his travels when outside of the City. In fact, Mr. Sotomayor purchased his Ruger LCP Max – a pocket-sized handgun – and a pocket holster specifically for that purpose.

---

[20] Penal Law § 400.00(6).
[21] Mr. Sotomayor also holds concealed carry licenses issued by the following states and jurisdictions: Arizona, Connecticut, Florida, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Utah, Virginia, Washington D.C., and West Virginia, which allows Mr. Sotomayor to lawfully carry a handgun in 44 states.

**JA24**

106.    In fact, the two handguns that Mr. Sotomayor chose to register to his NYC Special Carry License are a primary carry handgun and the Ruger LCP Max to carry as a backup.

107.    With the rise of violent criminal activity in the City, Mr. Sotomayor intends to carry a primary handgun and his Ruger LCP Max backup handgun when he travels to the City.

108.    The only reason Mr. Sotomayor cannot carry a backup handgun in New York City is the threat of being arrested and subject to criminal penalties, the revocation of his Special Carry License, and loss of his firearms. See, 38 RCNY 5-22(7).

109.    New York City prohibits regular citizens from carrying a backup handgun but places no limit on the number of handguns that an off-duty police officer can carry at one time.

110.    An August 2022 NYPD memorandum instructs all officers that:

> "Anyone carrying a firearm is presumed to be carrying unlawfully until proven otherwise."

> "Officers may stop an individual when the officer has reasonable suspicion that an individual is carrying a firearm…and may frisk that individual since the officer has reasonable suspicion that the individual is armed and dangerous."

111.    According to NYPD policy, exercising one's Second Amendment rights is a *de facto* waiver of one's Fourth Amendment rights and constitutionally protected conduct – carrying a firearm for self-defense - now gives the NYPD reasonable suspicion to believe an individual is 'dangerous' – with no exception for licensees.

112.    Any licensee who carries a handgun outside of his restrictions or in violation of any of the City's firearm regulations will be arrested and their handgun license will be revoked. Carrying outside of one's license restriction is a Class A Misdemeanor punishable by 1 year in jail, $1000 fine, and other civil and criminal penalties. See, Penal Law § 400.00(15).

# JA25

113.    The regulations challenged herein are overbroad, vague, and otherwise violate Plaintiffs' constitutional rights by criminalizing conduct that is presumptively protected by the plain text of the Second Amendment and this Nation's historical traditions.

114.    New York City's regulations have caused Plaintiffs to suffer concrete and actual harm for violations of their presumptively guaranteed and preexisting right to possess and carry weapons in common use in case of confrontation, and Plaintiffs will continue to suffer such concrete harms until the challenged regulations are permanently enjoined and stricken as unconstitutional.

## COUNT I
### U.S. CONST., AMEND. II, XIV - 42 U.S.C. § 1983
### (SECOND AMENDMENT, FOURTEENTH AMENDMENT)

115.    Plaintiffs repeat and reallege paragraphs "1" through and including "114" as if fully repeated herein.

116.    Under the theory that Defendant is liable to Plaintiffs for violations of their rights as protected by the Second and Fourteenth Amendments to the United States Constitution. 42 U.S.C. § 1983.

## COUNT II
### (*Monell* Liability)

117.    Plaintiffs repeat and reallege paragraphs "1" through and including "116" as if fully repeated herein.

118.    Under the theory that New York City is liable for the violations of Plaintiffs' constitutional rights, which were caused by and resulted from the enforcement of New York City's customs, practices, policies, and regulations as set forth herein. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

# JA26

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

- A judicial declaration that requiring individuals to pay money to the government for permission to possess and carry firearms violates the Second and Fourteenth Amendments;

- In the alternative, a judicial declaration that the requirement that an applicant and/or licensee pay more than a nominal fee to apply for and/or renew a handgun license violates the Second and Fourteenth Amendments;

- A judicial declaration that 38 RCNY 5-22(a)(7), (8), (9), and (10) violate the Second and Fourteenth Amendments;

- A judicial declaration that the provision 38 RCNY 5-25 violates the Second and Fourteenth Amendments;

- A judicial declaration that NYC Administrative Code 10-302.1(a)-(e) violates the Second and Fourteenth Amendments;

- The permanent injunction of 38 RCNY 5-22(a)(7), (8), (9), (10), 38 RCNY 5-25, and NYC Administrative Code 10-302.1(a)-(e);

- Presumed nominal damages against Defendant for the constitutional violations alleged herein;

- Garden variety compensatory damages;

- Reasonable statutory attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute; and

# JA27

- Such other further and alternative relief as the Court deems just and proper.

Dated: August 23, 2023
      Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiffs*

By:          /s                            
Amy L. Bellantoni (AB3061)
2 Overhill Road, Suite 400
Scarsdale, New York 10583
(914) 367-0090 (t)
(888) 763-9761 (f)
abell@bellantoni-law.com

**JA28**



THE CITY OF NEW YORK

# LAW DEPARTMENT

**Muriel Goode-Trufant**
*Acting Corporation Counsel*

100 CHURCH STREET
NEW YORK, NY 10007

**Nicholas R. Ciappetta**
**Administrative Law and Regulatory Litigation Division**
**(212) 356-4036**
**nciappet@law.nyc.gov**

August 16, 2024

**BY ECF**
Honorable Jed S. Rakoff
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:  <u>Mills, et al. v. New York City, New York</u>, 23-CV-7460 (JSR)(OTW)

Dear Judge Rakoff:

I am an attorney in the office of Muriel Goode-Trufant, Acting Corporation Counsel of the City of New York.  This Office represents Defendant New York City in the above-referenced litigation.  On December 8, 2023, Defendant filed its motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  <u>See</u> Docket Entry Nos. 13-15.  Plaintiffs filed their opposition to the motion to dismiss on January 22, 2024.  <u>See</u> Docket Entry No. 18.  Defendant's reply papers were filed on February 20, 2024.  <u>See</u> Docket Entry No. 23.  I write at the invitation of the Court to make a supplementary submission addressing the United States Supreme Court's recent Second Amendment decision in <u>United States v. Rahimi</u>, 144 S. Ct. 1889 (2024).  I also write to notify the Court regarding the recent adoption of emergency rules by the New York City Police Department ("NYPD") amending, among other things, one of the rules challenged by Plaintiffs.

**Impact of United States v. Rahimi**

Plaintiffs challenge a slew of important City laws and rules regulating firearms in the City of New York.  In addition to raising arguments that Plaintiffs lack standing to challenge certain of the firearm regulations at issue herein, Defendant also argued that Plaintiffs failed to state a claim under the Second Amendment.  More specifically, Defendants stated that Plaintiffs failed to demonstrate in the Complaint that any of their proposed conduct is protected by the Second Amendment.  Defendant's Second Amendment analysis focused solely on the first step of the revised framework developed by the Supreme Court in <u>New York State Rifle & Pistol</u>

# JA29

Ass'n v. Bruen, 597 U.S. 1 (2022). At the first step, the burden rests with the plaintiff to narrowly define its proposed conduct and then show that such proposed conduct is covered by the textual elements of the operative clause of the Second Amendment ("the right of the people to keep and bear Arms, shall not be infringed"). To show coverage, the challenged regulation must do more than regulate proposed conduct; rather, it must constitute an infringement upon Second Amendment rights. The City further argued in the motion to dismiss that none of the challenged rules and laws infringe upon conduct protected by the Second Amendment since they do not in infringe on the core of the right defined by the Supreme Court in Heller, McDonald, and Bruen. In other words, the challenged regulations do not prevent anyone from purchasing firearms for self-defense, possessing them for such purpose, or using them in the event of a confrontation. As the Plaintiffs' alleged regulated conduct is not protected by the text of the Second Amendment, their challenges fail at the first step of the Bruen test, and the City is not required to provide historical analogues to demonstrate consistency with the Nation's tradition of firearm regulations.

Rahimi does not alter the analysis or conclusions set forth in Defendant's motion papers. Therein, the Supreme Court did not address the first step of the Bruen inquiry; since Rahimi was prohibited by the challenged federal statute from possessing a firearm, there was no question that his proposed conduct implicated the Second Amendment. Instead, the Rahimi Court devoted its attention exclusively to the question of whether 18 U.S.C. § 922(g)(8) fit within the tradition of "preventing individuals who threaten physical harm to others from misusing firearms." Rahimi, 144 S. Ct. at 1896. In answering this question in the affirmative, the Supreme Court bucked the trend established in District of Columbia v. Heller, 554 U.S. 570 (2008), McDonald v. Chicago, 561 U.S. 742 (2010), and Bruen of expanding the scope of the Second Amendment. As Justice Clarence Thomas, who authored the majority opinion in Bruen, was the sole dissenter in Rahimi, the inescapable conclusion is that Rahimi represents a limitation on Bruen. See United States v. Herriott, No. 23-cr-37, 2024 U.S. Dist. LEXIS 110555, at *5 n.1 (N.D. Ind. June 24, 2024). Indeed, the Supreme Court emphasized that its prior decisions "were not meant to suggest a law trapped in amber." Rahimi, 144 S. Ct. at 1897.

While Rahimi eases the burden upon municipalities at the second step of Bruen, it did not provide any further guidance as to the application of the first step. Nonetheless, Rahimi does find some common ground with the Supreme Court's prior decisions in Heller, McDonald, and Bruen – in each case, it was undisputed that the challenged regulation made the exercise of a core right protected by the Second Amendment impossible for some. In other words, the challenged regulation either outright prohibited the plaintiff from possessing firearms or prevented the plaintiff from carrying in public. To date, these are the only type of regulations that the Supreme Court has found to constitute an infringement upon conduct protected by the Second Amendment. In contrast, the regulations and laws challenged herein do not even minimally burden core conduct protected by the Second Amendment. The regulations do not regulate the type of weapon that may be carried, the location where a licensee may carry, impose application requirements, or restrict who can obtain a premises residence or carry license. Thus, Rahimi does not change the fact that Plaintiffs' proposed conduct does not find protection in the text of the Second Amendment.

## Emergency Adoption of NYPD Rules

Defendant also writes to inform the Court of a recent change to one of the NYPD rules at issue herein. Plaintiffs seek to declare unconstitutional and permanently enjoin Title 38,

# JA30

Chapter 5-25 of the Rules of the City of New York ("RCNY"). In particular, Plaintiffs challenge 38 RCNY § 5-25(d)(4), which Plaintiffs allege constitutes a restriction on the number of handguns one may own and/or register on a license. See Complaint ¶¶ 47-54. As an initial matter, the City responded in its initial moving papers that Plaintiffs' reading of 38 RCNY § 5-25(d)(4) was disingenuous. "While this section contains *default* limits on the number of handguns that may be *listed* on premises residence and concealed carry licenses, this is not a functional cap on how many handguns the licensee may *own*." Docket Entry No. 15 at page 22 of 28 (emphasis in original). In any event, on August 12, 2024, the NYPD published emergency rules in *The City Record* that repealed 38 RCNY § 5-25 and replaced it with a new § 5-25. A copy of the relevant section of *The City Record* containing the emergency rules are annexed hereto as Exhibit A. Relevant to this case, the emergency rules now provide a procedure for a licensee to list more than two handguns on a carry license; whereas previously no such option existed. See 38 RCNY § 5-25(g)(3). As a result of this amendment, Plaintiffs' statements in paragraphs 51 and 52 of the Complaint are no longer accurate. The emergency rule also eliminates the ability of the NYPD License Division to reduce the number of handguns that may be listed on a carry license from two to one. Compare 38 RCNY § 5-25(g)(3) with former 38 RCNY § 5-25(d)(4)(i). This likewise renders moot Plaintiffs' argument in paragraph 54 of the Complaint. Plaintiffs also challenge handgun purchase authorization requirements that are set forth in 38 RCNY § 5-25 and cross-referenced at 38 RCNY §§ 5-22(a)(9), (10). The emergency rules also amend these requirements by clarifying and streamlining the procedures applicable to licensees seeking to acquire and register a handgun to one or more licenses. See 38 RCNY § 5-25(a)-(f).

Prior to the amendments to 38 RCNY § 5-25, the requirements therein did not operate to infringe upon any protected conduct under the Second Amendment because such requirements only constituted license restrictions rather than obstacles to the acquisition, possession, and carrying of firearms. The amendments to 38 RCNY § 5-25 only buttress the arguments set forth in Defendant's motion to dismiss.

Thank you for your consideration of this matter.

Respectfully submitted,

/s/

Nicholas Ciappetta
Senior Counsel

cc:    Amy L. Bellantoni, Esq. (via e-mail to abell@bellantoni-law.com)
THE BELLANTONI LAW FIRM, PLLC
2 Overhill Road, Suite 400
Scarsdale, New York 10583
Tel: 914-367-0090
Fax: 888-763-9761

(32 of 67), Page 32 of 67    Case: 24-3308, 03/24/2025, DktEntry: 27.1, Page 32 of 67
Case 1:23-cv-07460-JSR    Document 25-1    Filed 08/16/24    Page 1 of 4
JA31



**CELEBRATING OVER 150 YEARS**

# THE CITY RECORD

### Official Journal of The City of New York

THE CITY RECORD U.S.P.S.0114-660
Printed on paper containing 20% post-consumer material

---

VOLUME CLI    NUMBER 155      **MONDAY, AUGUST 12, 2024**      Price: $4.00

---

## TABLE OF CONTENTS

### PUBLIC HEARINGS AND MEETINGS
Board Meetings . . . . . . . . . . . . . . . . . . . . . 4053
City Planning Commission . . . . . . . . . . . 4054
Office of Labor Relations . . . . . . . . . . . . . 4057
Landmarks Preservation Commission . . 4058
Transportation . . . . . . . . . . . . . . . . . . . . . 4058

### PROPERTY DISPOSITION
Citywide Administrative Services . . . . . . 4058
Housing Preservation and
Development. . . . . . . . . . . . . . . . . . . . . . . 4059

### PROCUREMENT
Administration for Children's Services. . . 4059
Brooklyn Bridge Park . . . . . . . . . . . . . . 4060
Brooklyn Navy Yard Development Corp. 4060
City University. . . . . . . . . . . . . . . . . . . . . 4060
Citywide Administrative Services . . . . . . 4060
Correction . . . . . . . . . . . . . . . . . . . . . . . . . 4061
District Attorney - New York County . . . 4061
Finance . . . . . . . . . . . . . . . . . . . . . . . . . . . 4061
Health and Mental Hygiene . . . . . . . . . . 4061
Homeless Services . . . . . . . . . . . . . . . . . . 4061
Human Resources Administration . . . . . 4062

Law Department . . . . . . . . . . . . . . . . . . . 4062
Parks and Recreation. . . . . . . . . . . . . . . . 4062
Sanitation . . . . . . . . . . . . . . . . . . . . . . . . . 4063
School Construction Authority . . . . . . . . 4064
Small Business Services . . . . . . . . . . . . . 4065
Youth and Community Development . . . . 4065

### CONTRACT AWARD HEARINGS
Environmental Protection . . . . . . . . . . . . 4066
Information Technology and
Telecommunications. . . . . . . . . . . . . . . . . 4066

### AGENCY RULES
Buildings . . . . . . . . . . . . . . . . . . . . . . . . . 4066
Consumer and Worker Protection. . . . . . 4068
Police Department . . . . . . . . . . . . . . . . . . 4079

### SPECIAL MATERIALS
Comptroller . . . . . . . . . . . . . . . . . . . . . . . 4081
Health and Mental Hygiene . . . . . . . . . . 4081
Office of the Mayor. . . . . . . . . . . . . . . . . . 4081
Mayor's Office of Contract Services . . . . 4082
Changes in Personnel . . . . . . . . . . . . . . . 4083

### LATE NOTICE
Mayor's Office of Criminal Justice . . . . . 4083
School Construction Authority . . . . . . . . 4084
Probation . . . . . . . . . . . . . . . . . . . . . . . . . 4084

## THE CITY RECORD

**ERIC L. ADAMS**
Mayor

**LOUIS A. MOLINA**
Commissioner, Department of
Citywide Administrative Services

**JANAE C. FERREIRA**
Editor, The City Record

Published Monday through Friday except legal holidays by the New York City Department of Citywide Administrative Services under Authority of Section 1066 of the New York City Charter.

Subscription $500 yearly, $4.00 daily ($5.00 by mail).

Periodicals Postage Paid at New York, NY

POSTMASTER: Send address changes to The City Record, 1 Centre Street, Room 2170, New York, NY 10007-1602

Editorial Office/Subscription Changes:
The City Record, 1 Centre Street, Room 2170, New York, NY 10007-1602, (212) 386-0055, cityrecord@dcas.nyc.gov

**Visit The City Record Online (CROL) at www.nyc.gov/cityrecord for a searchable database of all notices published in The City Record.**

---

# PUBLIC HEARINGS AND MEETINGS

*See Also: Procurement; Agency Rules*

---

## BOARD MEETINGS

■ MEETING

### City Planning Commission
Meets in NYC City Planning Commission Hearing Room, Lower Concourse, 120 Broadway, New York, NY 10271, twice monthly on Wednesday, at 10:00 A.M., unless otherwise ordered by the Commission.

### City Council
Meets by Charter twice a month in Councilman's Chamber, City Hall, Manhattan, NY 10007, at 1:30 P.M.
### Contract Awards Public Hearing
Meets bi-weekly, on Thursday, at 10:00 A.M. In order to access the Public Hearing and testify, please call 1-646-992-2010, Access Code: 715 951 139, no later than 9:55 A.M.
### Civilian Complaint Review Board
Generally meets at 10:00 A.M. on the second Wednesday of each month at 40 Rector Street, 2nd Floor, New York, NY 10006. Visit http://www.nyc.gov/html/ccrb/html/meeting.html for additional information and scheduling changes.
### Design Commission
Meets at City Hall, Third Floor, New York, NY 10007. For meeting schedule, please visit nyc.gov/designcommission or call (212) 788-3071.
### Department of Education
Meets in the Hall of the Board for a monthly business meeting on the Third Wednesday, of each month at 6:00 P.M. The Annual Meeting is held on the first Tuesday of July at 10:00 A.M.
### Board of Elections
32 Broadway, 7th Floor, New York, NY 10004, on Tuesday, at 1:30 P.M. and at the call of the Commissioner.
### Environmental Control Board
Meets at 100 Church Street, 12th Floor, Training Room #143, New York, NY 10007 at 9:15 A.M. once a month at the call of the Chairman.
### Board of Health
Meets at Gotham Center, 42-09 28th Street, Long Island City, NY 11101, at 10:00 A.M., quarterly or at the call of the Chairman.
### Health Insurance Board
Meets in Room 530, Municipal Building, Manhattan, NY 10007, at the call of the Chairman.
### Board of Higher Education
Meets at 535 East 80th Street, Manhattan, NY 10021, at 5:30 P.M., on fourth Monday in January, February, March, April, June, September, October, November and December. Annual meeting held on fourth Monday in May.
### Citywide Administrative Services
Division of Citywide Personnel Services will hold hearings as needed in

(33 of 67), Page 33 of 67     Case: 24-3308   03/24/2025, DktEntry: 27.1, Page 33 of 67
Case 1:23-cv-07460-JSR     Document 25-1     Filed 08/16/24     Page 2 of 4
**JA32**

(ii) all disputes or requests for verification of the debt made by New York City consumers, identifying each consumer's name and account information, the date of the dispute or request for verification, and the date and type of response, if any, sent by the debt collector; and

(iii) all requests to cease further communication made by New York City consumers, identifying the consumer's name and account information, the date of the request, and the date and purpose of any further contacts by the debt collector after receipt of the request from the consumer.

To comply with this subdivision, debt collectors may combine all the monthly logs or records into one document or record or use a template: "Report for Consumer Activity" as made available on the Department's website at www.nyc.gov/dcwp.

Section 6. This rule takes effect on December 1, 2024.

☞ a12

## POLICE DEPARTMENT

■ NOTICE

NOTICE OF ADOPTION OF EMERGENCY RULES RELATING TO NON-RESIDENT APPLICANTS FOR CARRY LICENSES AND TO PURCHASE AND REGISTRATION AUTHORIZATIONS

The New York City Police Department ("NYPD"), pursuant to the authority granted by New York City Charter sections 435 and 1043(i), hereby adopts the following emergency rule, effective immediately, relating to non-New York resident applicants for a concealed carry handgun license and to handgun purchase and registration authorizations for all applicants.

### Statement of Basis and Purpose of Emergency Rule

On June 23, 2022, the United States Supreme Court ruled in N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022), that the State of New York's "proper cause" requirement for obtaining a concealed carry firearm license was an unconstitutional restriction on an individual's Second Amendment right to bear arms for self-defense. Since the issuance of that decision, New York City has revised its licensing regulations to remain consistent with current case law pertaining to handgun licensing and continues to do so in response to evolving Second Amendment jurisprudence, including the Supreme Court's decision in United States v. Rahimi, 602 U.S. __ (2024).

Current NYPD rules do not contain formal procedures for applicants who do not reside in New York State, are not principally employed within New York City, and do not have their principal place of business in New York City. A process by which non-State residents can apply for a carry license will ensure that the City is able to properly regulate handgun ownership within NYC while also complying with the Bruen decision. This emergency rule sets forth standards to submit and evaluate applications for carry licenses made by these individuals, hereinafter called "non-resident" applicants. This emergency rule also amends and clarifies the process of purchasing and adding firearms to an individual's New York City firearms license.

In order to maintain a clear and publicly accessible policy, New York City must immediately implement an operative concealed carry licensing process for non-resident applicants. This emergency rule addresses an imminent threat to safety and property, as it allows New York City to maintain a licensing scheme that preserves public safety within the City while ensuring that gun license applications are evaluated in a manner consistent with the Supreme Court's ruling in Bruen.

Delaying implementation of these additional rules would severely impede New York City's ability to effectively and legally regulate handgun ownership within its jurisdiction.

The following rules govern the NYPD's ability to administer handgun licenses and are issued on an emergency basis pursuant to Section 1043(i) of Chapter 45 of the New York City Charter.

New material is underlined. [Deleted material is in brackets]

"Shall" and "must" denote mandatory requirements and may be used interchangeably in the rules of this department, unless otherwise specified or unless the context clearly indicates otherwise.

**Section 1.** Section 5-03 of Title 38 of the Rules of the City of New York is amended to read as follows:

(a) In addition to the requirements in 38 RCNY § 5-02 and 38 RCNY § 5-05, an applicant seeking a carry or special handgun license or a renewal shall: have no conviction for a misdemeanor identified in

paragraph (n) of subdivision (1) of section 400.00 of the penal law within five years of the date of application; meet in person with a licensing officer in the License Division for an interview; and provide the documents listed below:

(1) References. The applicant must submit a minimum of four (4) character references who can attest to the applicant's good moral character and that the applicant has not engaged in any act or made any statement that suggests the applicant is likely to engage in conduct that would result in harm to themself or others. Two (2) of these references must be non-family members.

(2) [Social Media. The applicant must submit all of their current and former social media accounts from the past three years. For the purposes of this paragraph, the term "social media" means a website, application or other electronic platform whose principal purpose is to facilitate the public exchange of information, messages, news or ideas among such website's, application's or platform's users.

(3) ]Training Certification. The applicant must submit a certification of completion of the training required by § 400.00(1)(o)(iii) of the New York State Penal Law. The applicant must complete such training and receive such certificate no more than six (6) months prior to submission of their application. Applicants whose renewal applications are not subject to such training requirement shall nevertheless, within six months of each renewal, submit a certification of completion of two hours of a live-fire range training course that meets the requirements of § 400.00(19)(b) of the Penal Law.

(b) A person who resides outside of New York State and is not principally employed within New York City may apply for a carry handgun license pursuant to this section, provided that such applicant meets the following requirements:

1) The requirements of section 5-02, except that the requirement to demonstrate a residence or principal place of business within the confines of New York City under subdivision (g) of such section shall not apply to an application submitted pursuant to this subdivision;

2) The requirements of subdivision (a) of this section;

3) The requirements of section 5-05;

4) The submission of a form, to be provided by the department, that reflects the results of a background investigation undertaken for the purposes of obtaining a firearm license or firearm. The applicant shall provide such form to the local law enforcement agency in each jurisdiction in which the applicant has been a resident in the five (5) years preceding the date of the applicant's application for a license pursuant to this subdivision and shall submit such completed form to the License Division.

5) If the applicant holds a firearms license or permit in any other jurisdiction, such applicant must submit a form, to be provided by the department, indicating the current and past status of any firearms licenses held by the applicant, including whether such other license is currently in good standing, and whether the applicant has any previous suspensions, revocations, or periods where the license was not in good standing.

**§ 2.** Section 5-25 of Title 38 of the Rules of the City of New York, relating to handgun acquisition requirements is REPEALED, and a new section 5-25 is added to read as follows:

§ 5-25 Handgun Acquisition Requirements.

In addition to any applicable federal or state requirements, the following procedures apply to all licensees seeking to acquire and register a handgun to one or more of their licenses.

(a) No person shall acquire a firearm if such person has acquired a firearm within the previous ninety (90) days. Licensees who acquire and attempt to register more than one (1) firearm in a ninety (90) day period, shall not be granted an authorization form to take possession of an additional firearm until the ninety (90) day period has elapsed.

(b) Any licensee who obtains a handgun must purchase or obtain a safety locking device at the time of acquisition of such handgun, in accordance with section 10-311 of the Administrative Code, to be used for the safeguarding of the handgun when not in use. The following types of safety locking devices will be deemed to comply with the requirement to obtain a safety locking device:

(1) a trigger lock, which prevents the pulling of the trigger without the use of a key;

(2) a combination handle, which prevents the use of the weapon without the alignment of the combination tumblers; or

(3) a detachable or non-detachable locking device that is composed primarily of steel or other metal of significant gauge to inhibit breaking, and renders the weapon inoperable until the locking device is removed with a metal key or combination lock.

(34 of 67), Page 34 of 67    Case: 24-3308, 03/24/2025, DktEntry: 27.1, Page 34 of 67
Case 1:23-cv-07460-JSR    Document 251    Filed 08/16/24    Page 3 of 4
JA33

(c) A licensee may not take possession of a handgun without prior written authorization from the Division Head, License Division. For new and existing licensees, the License Division will provide a handgun purchase authorization form, which is valid for thirty (30) calendar days from the issuance date and must be provided to the firearms dealer at the time of purchase of such handgun.

(d) A licensee may not take possession of a handgun before it has been inspected by License Division personnel and entered on the license. A licensee must contact the License Division within 72 hours of purchase of such handgun to request inspection of the handgun and safety locking device. Requests for inspection must include the following:

(1) A completed authorization form issued by the License Division, in accordance with subdivision (c) of this section, with the background check number filled out by the firearms dealer from whom the handgun was purchased.

(2) The Bill of Sale/Receipt for the handgun which shall include the following information:

(i) make, model, calibre, and serial number of handgun sold;

(ii) Seller's name, address, and license number if applicable;

(iii) Buyer's name, address, and license number, date of sale.

If the handgun is acquired from an individual, rather than a dealer, the sale shall comply with the requirements set forth in section 898 of the General Business Law and the Bill of Sale shall be signed and notarized by the transferor.

(3) A color photograph depicting the entirety of the handgun purchased with accurate color representation,

(4) A color photograph that legibly captures the handgun's serial number.

(5) A color photograph depicting the safety locking device for the purchased handgun.

(6) Proof of possession of safe storage, which consists of:

(i) A Bill of Sale; and

(ii) Two (2) color photos of the safe or other locked container, one with the door open and one with the door closed. Photos may not be stock images and must depict the entirety of the safe, not merely a portion thereof.

The Division Head, License Division may reject the type of safe proposed for safeguarding the handgun, where it is determined that the safety features are insufficient to safeguard such handgun.

(7) Where the licensee has acquired a handgun from the estate of a deceased immediate family member, the licensee shall also provide:

(i) A copy of the voucher for the handgun(s).

(ii) The decedent's license, if not previously surrendered, showing registration of the handgun(s) in question.

(iii) A copy of the death certificate.

(iv) A notarized Bill of Sale from the Executor or Administrator of the decedent's estate, indicating the weapon, make, model, caliber and serial number, and stating that they are being sold to: the licensee's name, address and license number.

(v) If there is a Will: a short certificate of Letters Testamentary that gives the Executor the authority to dispose of the property.

(vi) If there is no Will: a short certificate of Letters of Administration that gives the administrator the authority to dispose of the property.

(e) For new licensees, the completed authorization form and license card with the registered handgun printed on such card shall be mailed to the licensee's address of record. The licensee shall use these documents to take possession of the registered handgun purchased from the seller. Following a completed transaction, or within ten (10) calendar days of its expiration date, the completed authorization form shall be returned to the License Division.

(f) The License Division may waive specific requirements identified in subdivision (d) of this section for extenuating circumstances, including, but not limited to, where a licensee lawfully acquired a handgun in another jurisdiction and has not maintained the Bill of Sale. The

licensee shall contact the License Division via email at DG_LIC-Purchaseorders@NYPD.org with a detailed explanation of such extenuating circumstances so that the License Division may provide individualized guidance on lawfully registering their firearm(s). The License Division may require the submission of additional information in such circumstances.

(g) Number of handguns allowed on a handgun license. The number of handguns allowed under each type of handgun license is listed below:

(1) Premises Residence – One handgun, except that additional handguns shall be approved upon request after the licensee shows evidence of appropriate safeguarding and establishes compliance with the mandatory waiting periods pursuant to subdivision (b) of § 10-302.1 of the Administrative Code and § 400.20 of the Penal Law.

(2) Premises Business – One handgun.

(3) Carry and Special Carry – Two handguns, provided that requests for additional handguns be evaluated in accordance with the standards set forth for a premise residence license in paragraph (1) of this subdivision. Carry and Special Carry licensees may only carry one (1) handgun at a time. Additional handguns must remain safeguarded.

(4) Carry Guard and Special Carry Guard – One handgun. Requests for additional handguns shall be reviewed on an individual basis.

(5) Gun Custodian – Number of handguns shall be determined by the Division Head, License Division, consistent with the demonstrated needs of the applicant.

(h) Requests for amendments to "Special Carry" and "Special Carry Guard" licenses – Holders of "Special Carry" licenses shall comply with the purchase authorization request guidelines of the county in which they hold their Carry handgun license. Once the addition has been made to a county handgun license, a request to amend a licensee's New York City Special Carry license may be made to the License Division, in writing, via email to: DG_LIC-Purchaseorders@NYPD.org. The following documents shall accompany the request:

(1) The licensee's current County Carry license;

(2) A copy of the county Handgun Purchase Authorization form; and

(3) A copy of the Bill of Sale.

**Required Finding Pursuant to New York City Charter Section 1043(i)(1)**

IT IS HEREBY CERTIFIED that the immediate effectiveness of this emergency rule, which establishes additional rules, regulations, and procedures for obtaining a concealed carry handgun license by a non-resident applicant, is required to adequately regulate handgun use and ownership by non-residents.

Current NYPD rules do not contain formal procedures for applicants who do not reside in New York State, are not principally employed within New York City, and do not have their principal place of business in New York City. A process by which non-State residents can apply for a carry license will ensure that the City is able to properly regulate handgun ownership within the NYC while also complying with the Bruen decision.

In order to maintain a clear and publicly accessible policy, New York City must immediately implement an operative concealed carry licensing process for non-resident applicants to address an imminent threat to safety and property. This emergency rule ensures that all applications are evaluated consistent with the Supreme Court's decisions in N.Y. State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022), and United States v. Rahimi, 602 U.S. ___ (2024), while also maintaining a licensing scheme that preserves public safety within the City. Delaying implementation of the additional rules would severely impede New York City's ability to effectively and legally regulate handgun ownership within its jurisdiction.

Additional amendments to the NYPD rules contained in this emergency rulemaking will ensure that the Police Department can continue to comply with the standards articulated in the Bruen and Rahimi decisions in a timely and appropriate fashion. Delaying implementation would severely impede New York City's ability to effectively and legally regulate handgun use and ownership within its boundaries.

Pursuant to section 1043(i)(2) of New York City Charter, the emergency rule will remain in effect for 60 days while the NYPD prepares a permanent rule.

(35 of 67), Page 35 of 67    Case: 24-3308, 03/24/2025, DktEntry: 27.1, Page 35 of 67
Case 1:23-cv-07460-JSR    Document 25-1    Filed 08/16/24    Page 4 of 4
JA34

**MONDAY, AUGUST 12, 2024**　　　THE CITY RECORD　　　**4081**

IT IS HEREBY CERTIFIED that the immediate effectiveness of a rule authorizing the NYPD to regulate concealed carry handguns within in New York City is necessary in order to maintain the public's safety.

Dated: August 1, 2024

/s/
Edward A. Caban
Police Commissioner

Dated: August 6, 2024

Approved

/s/
Eric Adams
Mayor of the City of New York

☛ a12

# SPECIAL MATERIALS

# COMPTROLLER

■ NOTICE

NOTICE OF ADVANCE PAYMENT OF AWARDS PURSUANT TO THE STATUTES IN SUCH cases made and provided, notice is hereby given that the Comptroller of the City of New York, will be ready to pay, at 1 Centre St., RM 629, New York, NY 10007 on 8/20/2024 to the person or persons legally entitled an amount as certified to the Comptroller by the Corporation Counsel on damage parcels, as follows:

Damage

| Parcel No. | Block | Lot |
|---|---|---|
| 1 | 1790 | 8 |

Acquired in the proceeding entitled: FIFTEENTH AMENDED HARLEM – EAST HARLEM URBAN RENEWAL PLAN (EAST 125TH STREET), STAGE 2 subject to any liens and encumbrances of record on such property. The amount advanced shall cease to bear interest on the specified date above.

BRAD S. LANDER
Comptroller

a6-19

# HEALTH AND MENTAL HYGIENE

■ NOTICE

### Notice of Concept Paper

The New York City Health Department intends to issue an RFP for the *Assuring STI Services Among Uninsured New Yorkers* program.

In order to address recent increases in reported sexually transmitted infections (STI) cases in NYC and the slow resumption of STI care-seeking practices following the COVID-19 pandemic, the New York City Health Department is assuring that New Yorkers have equitable access to STI services, including STI screening and treatment. To address unmet needs for STI services, we are seeking up to three contractors to provide STI services among uninsured (inclusive of those electing to self-pay) New Yorkers residing in neighborhoods with the highest chlamydia, gonorrhea, and syphilis case rates. The purpose of this RFP is to ensure that these individuals have equitable access to STI services.

Within the NYC Health Department, the Bureau of Hepatitis, HIV, and Sexually Transmitted Infections (BHHS)'s STI Program is dedicated to improving the sexual health of all New Yorkers. Assuring comprehensive and timely screening and treatment for STIs, including chlamydia, gonorrhea, and syphilis, is critical for preventing negative sequelae—

including infertility, increased susceptibility to HIV, and congenital syphilis—as well as preventing onward spread to sex partners.

The Concept Paper will be posted on the New York City Health Department website, www.nyc.gov/health, from August 19, 2024 through October 3, 2024. The Concept Paper will also be made available through PASSPort during the same time frame and can be found on the PASSPort procurement navigator website, https://passport.cityofnewyork.us/page.aspx/en/rfp/request_browse_public. Comments in response to the Concept Paper may be submitted, in writing, to RFP@health.nyc.gov by October 3, 2024. Please include **"STI Services CP Comments"** in the subject line. The New York City Health Department will also hold a meeting with interested providers to obtain feedback and input from the provider community. Please see the Concept Paper for date, time, and RSVP details.

☛ a12-16

# OFFICE OF THE MAYOR

■ NOTICE

EMERGENCY EXECUTIVE ORDER NO. 594
May 14, 2024

WHEREAS, over the past several months, thousands of asylum seekers have been arriving in New York City, from the Southern border, without having any immediate plans for shelter; and

WHEREAS, the City now faces an unprecedented humanitarian crisis that requires it to take extraordinary measures to meet the immediate needs of the asylum seekers while continuing to serve the tens of thousands of people who are currently using the DHS Shelter System; and

WHEREAS, additional reasons for requiring the measures continued in this Order are set forth in Emergency Executive Order No. 224, dated October 7, 2022, and Emergency Executive Order No. 538, dated December 27, 2023; and

WHEREAS, the state of emergency based on the arrival of thousands of individuals and families seeking asylum, first declared in Emergency Executive Order No. 224, dated October 7, 2022, and extended by subsequent orders, remains in effect;

NOW, THEREFORE, pursuant to the powers vested in me by the laws of the State of New York and the City of New York, including but not limited to the New York Executive Law, the New York City Charter and the Administrative Code of the City of New York, and the common law authority to protect the public in the event of an emergency:

Section 1. I hereby order that section 1 of Emergency Executive Order No. 592, dated May 9, 2024, is extended for five (5) days.

§ 2. This Emergency Executive Order shall take effect immediately and shall remain in effect for five (5) days unless it is terminated or modified at an earlier date.

Eric Adams
Mayor

☛ a12

EMERGENCY EXECUTIVE ORDER NO. 595
May 19, 2024

WHEREAS, on September 2, 2021, the federal monitor in the *Nunez* use-of-force class action stated that steps must be taken immediately to address the conditions in the New York City jails; and

WHEREAS, on June 14, 2022, the federal court in *Nunez* approved the *Nunez* Action Plan, which "represents a way to move forward with concrete measures now to address the ongoing crisis at Rikers Island"; and

WHEREAS, although there has been improvement in excessive staff absenteeism, extraordinarily high rates of attrition due to staff retirements and other departures continue to seriously affect the Department of Correction's (DOC's) staffing levels and create a serious risk to DOC's ability to carry out the safety and security measures required for the maintenance of sanitary conditions; and access to basic services, including showers, meals, visitation, religious services, commissary, and recreation; and

WHEREAS, this Order is given to prioritize compliance with the *Nunez* Action Plan and to address the effects of DOC's staffing levels, the conditions at DOC facilities, and health operations; and

JA35



BELLANTONI
LAW FIRM

August 16, 2024

<u>VIA ECF</u>

Hon. Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   *Mills v. New York City,* 23 Civ. 7460 (JSR)

Dear Judge Rakoff,

   I represent the plaintiffs, Charles Mills, Craig Sotomayor, and Braden Holliday, in the above-referenced matter. As the Court is aware, the defendants' Motion to Dismiss is *sub judice.* I write in response to the Court's August 2, 2024 email providing an opportunity for the parties to supplement their briefs in light of the Supreme Court's decision in *United States v. Rahimi,* 144 S. Ct. 1889 (2024).

   While the *Rahimi* case is not factually similar to this action, the Supreme Court reinforced the text, history, and tradition analysis applied in *Heller, McDonald, Caetano,* and *Bruen.* Indeed, Justice Gorsuch wrote separately to highlight the "central message" of the opinion: the reinforcement of "the focus on text, history, and tradition, following exactly the path we described in *Bruen.*" *Rahimi*, 144 S. Ct. at 1910 (Gorsuch concurring). "As a general matter, the text of the Constitution says what it means and means what it says. And unless and until it is amended, that text controls." *Rahimi*, 144 S. Ct. at 1911 (Kavanaugh, J. concurring).

   Justice Thomas, who wrote for the majority in *Bruen*, reiterated that the "presumption against restrictions on keeping and bearing firearms is a central feature of the Second Amendment. That Amendment does not merely narrow the Government's regulatory power. It is a *barrier*, placing the right to keep and bear arms off limits to the Government." *Rahimi*, 144 S. Ct. at 1931 (Thomas, J. dissenting) (emphasis added).

   The holding in *Rahimi* confirms that the government may temporarily disarm individuals who have been adjudicated by a court to present a credible threat to the physical safety of others. *Rahimi*, 144 S. Ct. at 1903. Notably, the Justices unanimously "reject[ed] the government's contention that [an induvial] may be disarmed simply because he is not 'responsible'." *Rahimi*, 144 S. Ct. at 1903.

# JA36

There is no allegation from the City that any of the Plaintiffs are 'dangerous' or 'not responsible.' The plaintiffs are part of 'the People' for whom the Second Amendment was intended to protect.

The motion pending before the Court concerns the City's challenge to the plaintiffs' Article III standing and failure to state a claim upon which relief may be granted. While Article III standing was not at issue in *Rahimi*, the opinion is instructive for the Court's determination of whether the plaintiffs have stated a claim under the Second Amendment.

Indeed, the cases cited by the City involve criminal activity, which the Supreme Court has repeatedly rejected as an analogue for the lawful conduct protected by the plain text of the Second Amendment [Pl. Br. at 10-12].

In his concurring opinion, Justice Kavanaugh noted: "The Framers of the Constitution and Bill of Rights wisely sought the best of both worlds: democratic self-government and the protection of individual rights against excesses of that form of government. In justiciable cases, this Court determines whether a democratically enacted law or other government action infringes on individual rights guaranteed by the Constitution. When performing that Article III duty, the Court does not implement its own policy judgments about, for example, free speech or gun regulation. Rather, the Court interprets and applies the Constitution by examining text, pre-ratification and post-ratification history, and precedent. The Court's opinion today does just that, and I join it in full. The concurring opinions, and the briefs of the parties and amici in this case, raise important questions about judicial reliance on text, history, and precedent, particularly in Second Amendment cases." *Rahimi*, 144 S. Ct. at 1910 (Kavanaugh, J. concurring).

When determining whether the Complaint states a cause of action, the *Rahimi* opinion "honor[s] the fact that the Second Amendment 'codified a pre-existing right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it. *Rahimi*, 144 S.Ct. at 1907 (Gorsuch, J. concurring) quoting, *D. C. v. Heller*, 554 U.S. 570, 592, 634–635 (2008). Plaintiffs' conduct – possessing and carrying firearms for self-defense - falls within the plain text and is presumed to be protected by the Constitution. The City has the burden of identifying an historical analogue, which it has not yet done; resolving this case under 12(b)(6) and/or (1) is inappropriate for a Second Amendment challenge such as this.

Thank you for the Court's consideration.

Very truly yours,

*Amy L. Bellantoni*

Amy L. Bellantoni


cc: Nicholas Ciappetta (via ECF)

**JA37**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MILLS ET AL,                        :
    Plaintiffs,                     :
                             :     23-cv-07460 (JSR)
       -v-                         :
                             :
NEW YORK CITY, NEW YORK             :
    Defendant.                      :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Before the Court is the opposed motion of defendant New York City

to dismiss the complaint in the above-captioned case (ECF No. 13). The

Court invited the parties to provide supplemental briefing in light

of the Supreme Court's intervening decision in *United States v. Rahimi*,

144 S. Ct. 1889 (2024), and they did so (ECF Nos. 24, 25). After

careful consideration, the Court grants defendant's motion to dismiss

in full. A memorandum explaining the reasons for this ruling will

issue in due course, at which time final judgment will be entered.

    SO ORDERED.

Dated: New York, NY
       September 25, 2024                    JED S. RAKOFF, U.S.D.J.

**JA38**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CHARLES MILLS, CRAIG SOTOMAYOR,
BRADEN HOLLIDAY,

                              Plaintiffs,                23 Civ. 7460 (JSR)

        -against-

                                               **NOTICE OF APPEAL**

NEW YORK CITY, New York,

                               Defendant.
-----------------------------------------------------------------x

      PLEASE TAKE NOTICE that the plaintiffs, CHARLES MILLS, CRAIG SOTOMAYOR,

BRADEN HOLLIDAY, hereby appeal to the United States Court of Appeals for the Second

Circuit from the attached Opinion and Order dated December 4, 2024 of the Hon. Jed S. Rakoff

granting the defendant's motion to dismiss the complaint and each and every part thereof that was

and is contrary to and/or prejudiced the plaintiffs' rights, claims, and interests.

Dated: December 17, 2024
         Scarsdale, New York

                          THE BELLANTONI LAW FIRM, PLLC
                          *Attorneys for Plaintiffs*

                          _____/s/_____
                          Amy L. Bellantoni (AB3061)
                          2 Overhill Road, Suite 400
                          Scarsdale, New York 10583
                          (914) 367-0090 (t)
                          (888) 763-9761 (f)
                          abell@bellantoni-law.com

**JA39**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
MILLS et al,                        :
    Plaintiffs,                    :
                           :      23-cv-07460 (JSR)
    -v-                            :      <u>OPINION AND ORDER</u>
                           :
NEW YORK CITY, NEW YORK             :
                           :
    Defendant.                     :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Before this Court is the motion of defendant New York City (the "City") seeking to dismiss the complaint (the "Complaint") filed by three individual plaintiffs: Charles Mills, Braden Holliday, and Craig Sotomayor. The Complaint alleges that a wide swath of the City's firearm regulations in Title 38 of the Rules of the City of New York ("38 R.C.N.Y.") and in the City's Administrative Code ("N.Y.C. Admin. Code") restricts conduct protected by the Second and Fourteenth Amendments of the United States Constitution. Plaintiffs request declaratory and injunctive relief as well as nominal and compensatory damages. On December 8, 2023, the City moved to dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim (Dkt. 13). Plaintiffs opposed (Dkt. 19). By "bottom-line order" dated September 25, 2024, the Court granted the City's motion to dismiss in full (Dkt. 26). This Opinion sets forth the reasons for that ruling and reconfirms that Order.

# JA40

## BACKGROUND

All plaintiffs reside in New York State. Complaint ¶ 3-5 (Dkt. 1)("Compl."). Holliday is a thirty-one-year-old African American male and a resident of the Bronx. Id. ¶ 64. He alleges that he attempted to obtain a handgun license from the License Division of the New York Police Department's ("N.Y.P.D.") — the department responsible for processing and issuing firearm licenses — but he learned that obtaining such a license was conditioned on his paying a mandatory application fee of $340 (and a corresponding tri-yearly renewal fee in the same amount), as well as an additional one-time fingerprinting fee of $88.50. Id. ¶¶ 29-30, 65-71. All of these fees, he alleges, are unconstitutional restrictions on his Second Amendment right to possess a gun.

Mills is a resident of Queens and, as required by the City's regulations, he holds two New York City licenses — a license to keep guns in his home (a "premise license") and a license that authorizes him to purchase, own, and carry a concealed handgun on his person (a "carry license"). Id. ¶¶ 77-78. Under the City's regulations, Mills is required to register every handgun that he owns on one of his licenses. Id. ¶ 81. Mills alleges that, even though he has multiple guns registered to his premise license, he is unconstitutionally limited to registering only two of those guns to his carry license at the danger of his carry license being revoked and him being found guilty of a Class A Misdemeanor for violation of the relevant regulation, should he exceed this limit. Id. ¶¶ 82-84. Further, Mills

# JA41

also alleges that the City's regulations unconstitutionally limit him to carrying only one handgun on his person and that if it were not for these regulations, he would have carried a backup handgun on a regular basis. Id. ¶¶ 92-98. Mills also alleges that when he tried to purchase/transfer/receive more than one firearm, he could not do so because every gun shop in New York City is statutorily prohibited from selling anyone more than one handgun within 90 days. Id. ¶ 85. Similarly, Mills also alleges that when he bought a new handgun and wanted to add that handgun to his carry license, he was unconstitutionally required to wait for 90 days. Id. ¶¶ 86-88, 90. And finally, Mills alleges that he has specific plans to purchase a Glock 21 from Woodhaven Rifle & Pistol shop, which he claims he would have already done if he: (1) was not required to wait for 90 days since his last handgun purchase/transfer; or (2) could have reached anyone in N.Y.P.D.'s License Division to obtain a Purchase Authorization Form, which he alleges was unavailable at N.Y.P.D.'s website at that time. Id. ¶¶ 88-89.

The third plaintiff, Sotomayor, is a twenty-three-year-old Nassau County resident. Id. ¶ 99. He possesses an "unrestricted (full carry) New York State concealed carry handgun license" issued in Nassau Country. Id. ¶ 100. But for Sotomayor to carry a handgun in the City, the City's regulations require him to apply for a Special License designated for non-city residents with valid county carry licenses. Id. ¶ 101. Sotomayor alleges that he possesses an "impressive and sizeable handgun collection" but is unconstitutionally "forced to

# JA42

choose two handguns from his collection to register to his Special Carry License" and prohibited from carrying a backup gun. Id. ¶¶ 102-114.

Based on the foregoing facts, plaintiffs allege that the following regulations restrict conduct protected by the Second and Fourteenth Amendments:

- The requirement to obtain authorization from the N.Y.P.D. prior to a purchase or an acquisition of a handgun, see 38 R.C.N.Y. §§ 5-25(a), 5-25(c), 5-22(9) (Compl. ¶¶ 33-44);

- The requirement to register a handgun, 38 R.C.N.Y. § 5-22(8) (id. ¶¶ 45-46);

- The restriction on the number of handguns a licensee may register on a carry license, 38 R.C.N.Y. § 5-25(d)(4) (id. ¶¶ 47-54);

- The restriction on purchasing/acquiring/transferring a maximum of one gun within 90 days, N.Y.C. Admin. Code § 10-302.1(a)-(e) (id. ¶¶ 55-62);

- The limit of two on the maximum number of handguns that a licensee may carry, 38 R.C.N.Y. § 5-22(a)(7) (id. ¶ 63);

- The handgun license application fee and renewal fees, N.Y.C. Admin. Code 10-l3l(a)(2) (id. ¶¶ 22-32). [1]

---

[1]    Despite seeking to declare unconstitutional certain portions of the City's regulations that impose licensing application fees, Compl. at 21, plaintiffs, in their complaint, fail to specify the challenged

# JA43

Id. ¶ 19.[2]

The City moved to dismiss all claims under either Federal Rule of Civil Procedure 12(b)(1) for lack of standing or under Rule 12(b)(6) for failure to state a claim. In light of the Supreme Court's intervening decision in United States v. Rahimi, 144 S. Ct. 1889 (2024), this Court ordered a supplemental round of briefing, which the parties duly filed. (Dkts. 24, 25). In this later briefing, the City informed the Court that on August 12, 2024, the N.Y.P.D. "published emergency rules in The City Record that repealed 38 R.C.N.Y. § 5-25 and replaced it with a new § 5-25." (Dkt. 25 at 3). The new emergency rule (1) eliminated N.Y.P.D.'s discretion to reduce the number of handguns that may be listed on a carry license, compare 38 R.C.N.Y. § 5-25(g)(3) with the former 38 R.C.N.Y. § 5-25(d)(4)(i); (2) provided for a procedure to list more than two handguns on a carry license, see 38 R.C.N.Y. § 5-25(g)(3); and (3) "clarif[ied] and streamlin[ed] the procedures applicable to licensees seeking to acquire and register a handgun to one or more licenses[,]" see 38 R.C.N.Y. § 5-25(a)-(f). (Dkt. 25 at 3).

---

regulations. The Court construes plaintiffs' claims in this regard as challenging N.Y.C. Admin. Code § 10-131(a)(2)-(3), which set forth an original and renewal application fee of $340.00 for pistols and revolvers.

[2]  See also Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss (Dkt. 19) at 1 (clarifying plaintiffs' challenges to the City's "regulations and policies").

# JA44

## DISCUSSION

### I.  Preliminary Issues

The Court must first consider whether it has jurisdiction. Dismissal under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction is proper when the district court "lacks the statutory or constitutional power to adjudicate" the action, "such as when . . . the plaintiff lacks constitutional standing to bring the action." Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L., 790 F.3d 411, 417 (2d Cir. 2015) (internal quotation marks and citation omitted). Dismissal under Rule 12(b)(1) is also proper "when a case becomes moot," Doyle v. Midland Credit Mgmt., Inc., 722 F.3d 78, 80 (2d Cir. 2013) (internal quotation marks and citation omitted). These limitations are derived from Article III of the Constitution, which cabins the courts' jurisdiction to deciding live cases or controversies. U.S. Const. art. III, § 2, cl. 1. In essence, Article III requires that "the dispute before the court must be real and live, not feigned, academic, or conjectural." Russman v. Bd. of Educ., 260 F.3d 114, 118 (2d Cir. 2001).

### a. Mootness

#### i. Maximum limit on the number of handguns per license

The Court first addresses the question of mootness raised by the amendments to § 5-25. North Carolina v. Rice, 404 U.S. 244, 246 (1971) ("Mootness is a jurisdictional question because the Court is not empowered to decide moot questions or abstract propositions[.]") (internal quotation marks omitted). In evaluating whether an issue is

6

# JA45

moot, a Court must consider "whether the relief sought would, if granted, make a difference to the legal interests of the parties." Green v. Mazzucca, 377 F.3d 182, 183 (2d Cir. 2004) (citation omitted). If it is "impossible . . . to grant any effectual relief whatever to a prevailing party," the court "must dismiss the case, rather than issue an advisory opinion." Fuller v. Bd. of Immigr. Appeals, 702 F.3d 83, 86 (2d Cir. 2012).

A defendant, however, "cannot automatically moot a case simply by ending its unlawful conduct once sued." Already, L.L.C. v. Nike, Inc., 568 U.S. 85, 91 (2013) (citation omitted). Instead, a defendant claiming that a case is moot "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. (citing Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc., 528 U.S. 167, 190 (2000)). Where a defendant voluntarily ceases to engage in the challenged conduct, the case will not be rendered moot unless the defendant can demonstrate that "(1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Mhany Mgmt., Inc. v. County of Nassau, 819 F.3d 581, 603 (2d Cir. 2016) (citation omitted).

Applying these standards, the Court concludes that plaintiffs' claims for declaratory and injunctive relief with respect to the limitations on the number of handguns that may be simultaneously registered on a carry license, formerly found in 38 R.C.N.Y. § 5-

7

# JA46

25(d), are now moot. To begin with, defendants voluntarily ceased the allegedly unlawful conduct by repealing the regulation and the Court thus cannot now award the requested relief. The situation is thus "sufficiently altered so as to present a substantially different controversy from the one that existed when this suit was filed." Lamar Advert. of Penn, L.L.C. v. Town of Orchard Park, 356 F.3d 365, 378 (2d Cir. 2004) (internal quotation marks omitted). Furthermore, there is "no reasonable expectation" that plaintiffs' alleged injury — the limitation on the number of handguns on a given carry license — will recur. See Knight v. City of New York, 2022 WL 18587766, at *4 (S.D.N.Y. Dec. 28, 2022), report and recommendation adopted, 2023 WL 371427 (S.D.N.Y. Jan. 24, 2023) (finding that the plaintiff's claims against the City after the city adopted an emergency rule eliminating the challenged requirement are moot); see also N.Y. State Rifle & Pistol Ass'n. v. City of New York, 140 S. Ct. 1525, 1526 (2020).

For the same reasons, the Court concludes that plaintiffs' request for declaratory and injunctive relief with respect to the discretionary provisions that allowed the N.Y.P.D. to decrease the number of firearms on a license, formerly found in 38 R.C.N.Y. § 5-25(d)(4)(i)), is now also moot.

However, insofar as plaintiffs seek retrospective actual or nominal damages for alleged constitutional violations related to the regulatory limits on the number of guns per carry license, that claim is not moot. See Compl. at 21; Fox v. Bd. of Trustees of State Univ. of New York, 42 F.3d 135, 142 (2d Cir. 1994); ("[A] claim for nominal

# JA47

damages can suffice to avoid mootness when claims for injunctive and declaratory relief have become moot."); 13C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3533.3 (3d ed. 2023) ("The availability of damages or other monetary relief almost always avoids mootness[.]")

      b. <u>Standing</u>

The City argues that plaintiffs lack standing to challenge the regulations concerning (1) handgun purchase authorization, (2) the 90-day waiting period requirement, and (3) the limitation on the number of handguns per carry license.

To satisfy the standing requirements of Article III, a plaintiff must establish three elements: "(1) the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.</u>, 651 F.3d 218, 228 (2d Cir. 2011). Additionally, "[t]o establish standing to obtain prospective relief," in this case — declaratory and permanent injunctive relief — "a plaintiff must show a likelihood that he [or she] will be injured in the future[,]" <u>Carver v. City of New York</u>, 621 F.3d 221, 228 (2d Cir. 2010) (alterations added), "[t]hat is, a plaintiff must demonstrate a

# JA48

'certainly impending' future injury." <u>Marcavage v. City of New York</u>,
689 F.3d 98, 103 (2d Cir. 2012).

  i. Handgun Purchase Authorization & Registration

  Plaintiffs seek to declare unconstitutional the entirety of 38
R.C.N.Y. § 5-25 (formerly known as "Handgun Purchase Authorization and
Safety Locking Device Requirements," now the "Handgun Acquisition
Requirements") and to permanently enjoin the enforcement of that rule.
Compl. at 21. The City argues that (1) the requested relief is
overbroad because § 5-25 contains requirements, such as the locking
requirements, that plaintiffs do not address in their complaint at
all, and that (2) plaintiffs lack standing because they have not
established that the purchase authorization portions of the regulation
had injured them. Defendant's Memorandum of Law in Support of Motion
to Dismiss the Complaint (Dkt. 15) at 4-5, 22 ("MTD Mem."). In
response, plaintiffs concede that they are not challenging the safety
locking requirements now found in § 5-25(b), <u>see</u> 38 R.C.N.Y. § 5-
25(b). Plaintiffs' Memorandum of Law in Opposition to Defendant's
Motion to Dismiss (Dkt. 19) at 4 ("MTD Opp."). But they stick by their
challenge to the purchase authorization requirement of 38
R.C.N.Y. § 5-25(a) (now 38 R.C.N.Y. § 5-25(c)).

  The purchase authorization requirement is one of several steps a
handgun licensee must complete to acquire a handgun, <u>see</u> <u>generally</u>
38 R.C.N.Y. § 5-25. One of those steps, as relevant here, requires the
licensee to obtain a "prior written authorization from the Division

10

# JA49

Head, License Division." 38 R.C.N.Y. § 5-25(c). <u>See also</u> 38 R.C.N.Y. § 5-22(9) (addressing the "Conditions of Issuance") ("The licensee shall not purchase or replace a handgun prior to obtaining written permission from the Division Head, License Division[.]"). Further, a licensee "who acquire[s] and attempt[s] to register more than one (1) firearm in a ninety (90) day period, shall not be granted an authorization form to take possession of an additional firearm until the ninety (90) day period has elapsed." 38 R.C.N.Y. § 5-25(a).

However, "[f]or new and existing licensees, [the N.Y.P.D.'s] License Division <u>will</u> provide a handgun purchase authorization form, which is valid for thirty (30) calendar days from the issuance date and must be provided to the firearms dealer at the time of purchase of such handgun." 38 R.C.N.Y. § 5-25(c) (emphasis added). After the purchase (or the form's expiration date), a licensee must return the form to the License Division.

This Court concludes that none of the three plaintiffs here has alleged any cognizable injury traceable to the purchase authorization rule, which essentially obliges N.Y.P.D. to automatically issue purchase authorizations to licensees. Two plaintiffs (Mills and Sotomayor) possess both carry and premise licenses and were able to purchase guns pursuant to these licenses, Compl. ¶¶ 78, 100. The third plaintiff (Holliday) alleges that he cannot obtain a gun because of the cost of the application fee and not because of the alleged burden associated with the purchase authorization requirement. <u>Id.</u> ¶ 68.

# JA50

Furthermore, neither Mills nor Sotomayor alleges that the purchase authorization deterred them from applying for a license or that the N.Y.P.D. refused to issue a purchase authorization. Read generously, Mills alleges, at most, some prior injury associated with the lost time incurred by him as a result of the purchase request authorization form being temporarily unavailable on the N.Y.P.D.'s website. Id. ¶ 89. But that had nothing to do with the purchase authorization itself. Moreover, plaintiff has not established that he is "likely to be harmed again in the future in a similar way," and he thus does not have standing to seek injunctive relief. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016).

In a cursory fashion, plaintiffs also challenge the firearm registration regime. Compl. ¶¶ 45-46 & p. 21. Like the purchase authorization requirement, the firearm registration is one of the conditions of the issuance of a firearm license, mandating in relevant parts that "[t]he licensee is authorized to own only the handgun(s) that are listed on their license." 38 R.C.N.Y. ¶ 5-22(8). Plaintiffs do not allege that the mere act of registering the firearm injured them, nor do they claim that they were deprived of their right to keep and bear arms because of this requirement. In summary, they do not have standing to litigate what are no more than "generalized grievances" about the firearm regulation regime. See Gill v. Whitford, 585 U.S. 48, 65 (2018).

# JA51

### ii.  90-day Waiting Period

Next, plaintiffs challenge N.Y.C. Admin. Code § 10-302.1(a)-(e), which governs several types of conduct. Subsections (a) and (b) impose on licensees and firearm dealers a mandatory 90-day waiting period for anyone wishing to acquire or transfer a firearm. Subsections (c) through (e) impose firearms disposal requirements, such as that firearm dealers must follow certain record-keeping requirements. N.Y.C. Admin. Code § 10-302.1(c)-(e). As to (c) through (e), plaintiffs argue that they have standing because "acquisition simultaneously involves a disposition by a licensed firearm dealer/gun store." MTD Opp. at 4. But plaintiffs have not alleged any injury to themselves traceable to the disposition requirements imposed by (c) through (e), and they thus lack standing to challenge those subsections. However, the story is different as to subsections (a) and (b). The City argues that plaintiffs do not have standing to challenge subsection (a) because it imposes a 90-day waiting period for firearms dealers rather than individuals (who are governed by subsection (b)), and plaintiffs are not dealers in firearms. MTD Mem. at 5. A court may find third-party standing, however, where there is "a predictable chain of events leading from the government action to the asserted injury." Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 385 (2024). See also Warth v. Seldin, 422 U.S. 490, 505 (1975) ("When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the

## JA52

injury does not necessarily deprive the person harmed of standing to vindicate his rights."); Gazzola v. Hochul, 88 F.4th 186, 194 (2d Cir. 2023) (per curiam) (holding that gun vendors may bring Second Amendment claims on behalf of firearm purchasers). Here, plaintiffs have third-party standing to challenge the 90-day waiting period requirements applicable to dealers under subsection (a) because that regulation causally relates to the alleged injury to the plaintiffs-licensees, i.e., the 90-day temporary deprivation of each firearm acquisition or transfer. And as for subsection (b), the City does not contest that plaintiffs have standing to challenge the 90-day waiting period as applicable to individuals. The Court thus concludes that plaintiffs have standing to challenge N.Y.C. Admin. Code § 10-302.1(a) and (b), but not § 10-302.1(c)-(e).

      iii. Maximum limit on the number of handguns per license

The Court next considers plaintiffs' standing to sue for injuries allegedly suffered in connection with the City's regulations limiting the number of handguns registered on a carry license. Specifically, § 5-25(d)(4)(i) formerly limited to two the number of handguns that a licensee could register to a carry license. The same subsection had also formerly permitted the N.Y.P.D. to limit to one the number of handguns that appear on a carry license "when the licensee's needs do not require possession of two handguns." 38 R.C.N.Y. § 5-25(d)(4)(i). Section 5-25(d)(4)(vi), in turn, limited to one the number of handguns allowed on a premise license. Licensees could add additional handguns

# JA53

to the premise license, and those requests were "reviewed on an individual basis." 38 R.C.N.Y. § 5-25(d)(4). Licensees could either add a maximum of two new guns to the carry license or swap out the handguns registered on their carry license with those registered on their premise license, thus allowing them to carry their desired weapon of choice. Each acquisition of a firearm triggers a 90-day waiting period. 38 R.C.N.Y. § 5-25(a); N.Y.C. Admin. Code § 10-302.1(b).

The City argues that plaintiffs fail to allege that they have suffered any injury as a consequence of either a denial of their request to add "additional handguns to a premises residence license or a decision by the License Division to limit Mills or Sotomayor to less than two handguns on a carry license." MTD Mem. at 6. Plaintiffs aver that their injury stems from having to choose which two guns they are permitted to carry on their persons. MTD Opp. at 6. Specifically, Mills alleges that he "intends to decide for himself which of his handguns to carry on any particular day, and to then carry it for self-defense, and objects to being required to seek and obtain permission from a government employee." Compl. ¶ 92. The Court finds that plaintiff Mills has standing to bring a claim for damages arising from the limitations formerly found in § 5-25(d) because he was deterred from applying for permission to transfer his handgun from one license to another, which restricted his purported right to a weapon of choice without any temporal restraints. The alleged injury is traceable to the City's enforcement of the regulations, that is, the City's refusal to register more than two handguns on a carry license,

# JA54

and the injury is redressable by nominal damages. See Antonyuk v. James, 120 F.4th 941, 977-78 (2d Cir. 2024) (holding that a plaintiff had standing to bring a challenge to certain New York's licensing regulations where he was deterred from seeking a license due to these requirements). See also Uzuegbunam v. Preczewski, 592 U.S. 279 (2021) ("A request for nominal damages satisfies the redressability element necessary for Article III standing where a plaintiff's claim is based on a completed violation of a legal right."). Sotomayor, however, does not allege a similar forward-looking injury and he therefore lacks standing to sue.

## II. Motion to Dismiss

Having resolved the standing and mootness issues, the Court turns to whether those plaintiffs' claims that are not moot and as to which they have standing survive the defendant's motion to dismiss. Under Rule 12(b)(6), a court must dismiss a complaint for failure to state a claim if, inter alia, the complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to a presumption of

# JA55

truth. Id. "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Nielsen v. AECOM Tech. Corp., 762 F.3d 214, 218 (2d Cir. 2014) (quoting Twombly, 550 U.S. at 555). The court must draw all reasonable inferences in the nonmovant's favor. Graziano v. Pataki, 689 F.3d 110, 114 (2d Cir. 2012).

As to the regulations governing the acquisition and licensing of guns, neither plaintiff Mills nor plaintiff Sotomayor alleges that the City enforced the challenged regulations against them. Plaintiffs thus only bring a facial challenge to those regulations. See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015) ("Because plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-applied,' challenge."). To mount a successful facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Unsurprisingly, facial challenges are "the most difficult to mount successfully." City of Los Angeles v. Patel, 576 U.S. 409, 415 (2015) (alteration and citation omitted).

Second Amendment

All the claims, whether facial or otherwise, that remain after certain claims have been dismissed for mootness or lack of standing, allege violation of the Second Amendment. The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not

# JA56

be infringed." U.S. Const. amend. II. For "over two centuries," "[t]he meaning of the Second Amendment ha[d] been considered settled by courts and legislatures" and "judges and legislators ... believed ... that the Second Amendment did not reach possession of firearms for purely private activities." District of Columbia v. Heller, 554 U.S. 570, 676 n. 38 (2008) (Stevens, J., dissenting). In Heller, however, the Supreme Court held that the Second Amendment protected the right to bear arms unconnected to the service in the militia. Id. at 636. Since Heller, the lower courts have struggled with discerning the scope of that right, resulting in multiple Supreme Court clarifications: first in McDonald v. City of Chicago, 561 U.S. 742 (2010), then in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022), and most recently United States v. Rahimi, 144 S. Ct. 1889 (2024). Taken together, these cases, as applied to challenges to firearm regulations, require courts to adopt a two-step approach. Under step one, a court must ascertain whether the regulations at issue apply to conduct that falls within the activities governed by the plain text of the Second Amendment as historically understood. If the answer is in the affirmative, then at step two, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24; see also Antonyuk v. James, 120 F.4th 941, 968 (2d Cir. 2024) ("Bruen requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining

# JA57

whether the challenged law is consistent with this Nation's historical tradition of firearms regulation[.]"); United States v. Price, 111 F.4th 392, 398 (4th Cir. 2024) (en banc) ("First, we must ask whether the Second Amendment's plain text covers the conduct at issue. If not, that ends the inquiry: the Second Amendment does not apply.").

This case is different from all of the three Supreme Court cases cited above, in that none of the predominantly administrative regulations here operates to permanently deprive applicants of their right to own and carry firearms. Under the challenged rules, anyone with a general desire to obtain a gun can obtain one upon fulfilling certain predominantly non-discretionary administrative requirements and paying a fee.

Turning to step one, the Court's analysis must thus begin with a "textual analysis focused on the normal and ordinary meaning of the Second Amendment language." Bruen, 597 U.S. at 20 (internal quotation marks omitted). Plaintiffs argue, however, that the challenged regulations all impact and implicate their right to keep and bear firearms, MTD Opp. at 9-10, and therefore the burden is on the government to show that these challenged regulations are "consistent with this Nation's historical tradition of firearm regulation" under step two. Bruen, 597 U.S. at 20. But this is far too facile and would essentially eliminate the step-one analysis whenever a regulation has the slightest connection to guns. No case goes anywhere near so far. Rather, the Supreme Court in Heller interpreted the text of the Second Amendment to encompass a specific right, which is the "right to possess

# JA58

and carry weapons in case of confrontation." Heller, 553 U.S. at 592 (emphasis added). So delimited, the Second Amendment has been recognized to coexist with ubiquitous local and state licensing regulations. See Antonyuk, 120 F.4th at 994.

Indeed, the high level of generality proposed by plaintiffs would sweep into the scope of the protections afforded by the Second Amendment any regulations affecting firearms – a result inconsistent with Bruen itself. Oakland Tactical Supply, LLC v. Howell Twp., 103 F.4th 1186, 1195 (6th Cir. 2024) (explaining that in Bruen, the Supreme Court defined the proposed conduct protected by the Second Amendment with specificity by incorporating both "the purpose and location of the plaintiffs' desired action"). In Bruen, the Supreme Court explained that nothing in that decision "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a [permit].'" 597 U.S. at 38 n.9.[3] "[B]ecause these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public

---

[3]    While arguably dictum, this statement should be given considerable weight. See, e.g., United States v. Bell, 524 F.2d 202, 206 (2d Cir.1975) ("[A] distinction should be drawn between 'obiter dictum,' which constitutes an aside or an unnecessary extension of comments, and considered or 'judicial dictum' where the Court . . . is providing a construction of a statute to guide the future conduct of inferior courts. While such dictum is not binding upon us, it must be given considerable weight and cannot be ignored in the resolution of a close question we have to decide.").

# JA59

carry." <u>Id.</u> (citing <u>Heller</u>, 554 U.S. at 635). Rather, the "shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure that only those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" and "appear to contain only narrow, objective, and definite standards guiding licensing officials." <u>Id.</u>

In his concurrence joined by Chief Justice Roberts, Justice Kavanaugh further reinforced the point by emphasizing that "[t]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense [and] [i]n particular ... does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." <u>Id.</u> at 79 (Kavanaugh, J., concurring). Because the majority in <u>Bruen</u> concluded that the objective shall-issue regimes are constitutional without first employing a historical analysis, such regulatory regimes can be properly viewed as presumptively constitutional because they do not operate to "deny ordinary citizens their right to public carry." <u>Bruen</u>, 597 U.S. at 38 n.9. In other words, shall-issue licensing regimes do <u>not</u> infringe upon rights protected by the Second Amendment "so long as they allow persons contemplated by the Second Amendment to keep and bear arms and are not applied in practice to frustrate that right[.]" <u>United States v. Libertad</u>, 681 F. Supp. 3d 102, 111 (S.D.N.Y. 2023). <u>See also</u> <u>Md. Shall Issue, Inc. v. Moore</u>, 116 F.4th 211, 222 (4th Cir. 2024) ("[I]n accord with the Supreme Court's 'shall-issue' discussion, we hold that non-discretionary 'shall-issue' licensing laws are

# JA60

presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the Bruen framework.").

It follows that, so far as plaintiffs' facial challenges are concerned, plaintiffs have failed to show that the challenged regulations are foreclosed by the text of the Second Amendment. The same result is reached, moreover, if one considers regulations here at issue not only on their face but also as applied to plaintiffs here and others similarly situated in this regard. In this respect, the Court considers each of the challenged regulations separately.

### a. 90-day Waiting Period

Plaintiffs allege that the City's regulations imposing a 90-day waiting period for acquiring, selling, or transferring firearms, see N.Y.C. Admin. Code § 10-302.1(a)-(b), are unconstitutional because, as plaintiffs claim, they have a right to acquire handguns without any temporal limitations on the rate of acquisition or transfer. But nothing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms "on demand" as opposed to having to wait a short period of time. And Plaintiffs do not allege that the 90-day waiting time for the acquisition of handguns is so lengthy as to suggest that the regulations unreasonably and unconstitutionally restrict the right to carry a handgun for self-defense. See Md. Shall Issue, Inc. v. Moore, 116 F.4th 211, 216 (4th Cir. 2024) (en banc) (holding that "Bruen foreclosed the plaintiffs'

# JA61

'temporary deprivation' argument by stating that, despite some delay occasioned by 'shall-issue' permit processes, [that] type of licensing law is presumptively constitutional because it operates merely to ensure that individuals seeking to exercise their Second Amendment rights are 'law-abiding' persons."). Plaintiffs' challenge to the 90-day waiting period for acquisition of firearms therefore fails.

### b. Limit on Carrying of Firearms

Petitioners further challenge the City's limitation on "Carry License" and "Special Carry" (out-of-town) license holders, which allows licensees to carry "only one (1) handgun . . . on their person at any time." 38 R.C.N.Y. § 5-22(a)(7). Plaintiffs Mills and Sotomayor allege that they were injured because they cannot regularly carry a second, backup gun. Compl. ¶¶ 94-98, 107-112. The City contends that the regulation does not "infringe" plaintiffs' Second Amendment rights because it "does not restrict the issuance of a license in the first instance, or prevent the licensee from defending themselves[.]" MTD Mem. at 21-22.

Plaintiffs have failed to expressly define the specific protected conduct affected by the foregoing regulation, but the Court assumes that it is the carrying of at least two handguns. The Court must determine whether such conduct falls within the plain text of what is protected by the Second Amendment, which states that "the right of the people to keep and bear Arms, shall not be infringed." Noah Webster's American Dictionary of the English Language from 1828 defined

# JA62

"infringe" as "to break, as contracts," "to violate," and "to destroy or hinder." Noah Webster, American Dictionary of the English Language (1828), available at https://archive.org/details/americandictiona01websrich/page/970/mode/2up?q=infringe. The applicable word here is "hinder," but for the purposes of the instance case, it is unnecessary to decide the level of hindrance that would violate the individual right to bear arms in case of confrontation, because the text of the Second Amendment as well as the relevant Supreme Court caselaw is clear that the central purpose of the Amendment is individual self-defense. Bruen, 597 U.S. at 29 (quoting Heller, 554 U.S. at 599) ("Individual self-defense is 'the central component' of the Second Amendment right.") (emphasis in text); see also Heller, 554 U.S. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). Plaintiffs here can defend themselves in the City in case of confrontation by carrying a single handgun, and they do not allege otherwise. This Court therefore dismisses plaintiffs' challenge to the limitation on the number of handguns a licensee is permitted to carry.

    c. Maximum limit on the number of handguns on a license

Plaintiff Mills next challenge the repealed requirements of § 5-25(d), which limited the number of handguns that a licensee could register on a carry license. Mills possesses numerous handguns, two of which he registered on his carry license with the rest being registered on his premise license. Compl. ¶ 78-83. The City's

## JA63

requirements that obliged him to file certain administrative paperwork to satisfy the preferences for his choices of weapons to carry on his person plainly did not infringe his "right to possess and carry weapons in case of confrontation." Heller, 553 U.S. at 592. In essence, Mills argues that his preference to choose as between the different guns he owns without any temporal restrictions is constitutionally protected conduct. The Constitution, however, does not concern itself with the vagaries of consumer tastes and preferences. See, e.g., Gazzola v. Hochul, 88 F.4th 186 (2d Cir. 2023) (per curiam)(holding that "gun buyers have no right to have a gun store in a particular location," "[n]or do they have a right to travel no more than short distances to the most convenient gun store that provides what they deem a satisfactory retail experience") (internal quotation marks omitted); Teixeira v. Cnty. of Alameda, 873 F.3d 670, 680 (9th Cir. 2017) (en banc) ("[T]he Second Amendment does not elevate convenience and preference over all other considerations."). Thus, the administrative burden of adding handguns to a carry license does not infringe on Second Amendment rights, and plaintiffs challenge to this regulation fails as well. See, e.g., United States v. Scheidt, 103 F.4th 1281, 1284 (7th Cir. 2024) (holding that "[o]rdinary information-providing requirements . . . do not 'infringe' the right to keep and bear arms.)

   d. Licensing fees

   Finally, plaintiffs argue that "more than a nominal fee" assessed in connection with an application for a handgun license or renewal

# JA64

thereof is also unconstitutional. Compl. at 21. As already discussed, the application fees, like other objective requirements of the so-called shall-issue regimes, which are ubiquitous amongst the fifty states, are presumptively lawful because they do not infringe on the rights of "law-abiding, responsible citizens . . . to public carry." Bruen, 597 U.S. at 38 n.9. This interpretation is consistent with the Second Circuit's decision in Kwong v. Bloomberg, in which the court upheld the constitutionality of the very same $340 licensing fee. 723 F.3d 160, 165–69 (2d Cir. 2013). Borrowing a framework from the First Amendment context, the Second Circuit held that the imposition of "fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity." Id. at 166. Bruen clearly did not alter this holding because it found licensing fees "presumptively lawful" so long as the fees were not "exorbitant [so as to] deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9.

Plaintiffs have made no showing that the modest fees implicated here are in any sense exorbitant. Instead, they take a position foreclosed by the Supreme Court and Second Circuit's precedent: they argue that "[r]equiring that an individual pay a fee to the government before they can exercise the right to possess and/or carry weapons in common use is repugnant to the plain text of the Second Amendment and inconsistent with text, history, and tradition." Compl. ¶ 31. The foregoing cases clearly rebut that position. Further, because

# JA65

plaintiffs also fail to allege the fees are excessive such that they effectively deprive applicants of their Second Amendment rights, plaintiffs' facial challenge similarly fails.[4] Evidence in the record further suggests that the fee is not excessive and designed to defray regulatory costs. Instead, the application fee has not increased since the Second Circuit's decision in Kwong over ten years ago, even though the fee must offset inflationary pressures and various administrative expenses that have increased in the interim. MTD Mot. at 17 (citing New York Penal Law §§ 400.00(1), (19)).

In short, those of plaintiffs' claims that are not dismissed because of mootness or lack of standing must be dismissed for failure to survive step one of the Supreme Court two step Second Amendment analysis. Although the Court therefore need not reach step two, it may be noted that here, too, plaintiffs claim would likely fail. The New York City's licensing requirements belong amongst some the oldest firearm regulations in the Nation.[5] These enduring regulations "originated in the cities of the post-Civil War period . . . [as] the

---

[4] The Complaint does not clearly indicate whether plaintiff Holliday mounts an as-applied challenge to Administrative Code § 10-131(a)(2)-(3), and this Court is under no obligation to construe the pleadings liberally because plaintiffs are represented by counsel. Regardless, the Court finds that an as-applied challenge fails as well because the Complaint alleges, in a barebones and conclusory fashion and without alleging any facts pertaining to Holliday's financial status, that he cannot afford to pay a fee every three years.

[5] See, e.g., New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, § 2 (Feb. 12, 1878), printed in Proceedings of the Board of Aldermen of the City of New York 612-16 (1878). See generally Antonyuk, 120 F.4th at 988-89 (cataloguing New York City's regulations).

## JA66

result of changes in American society in the nineteenth century, including urbanization and concomitant shifts in norms of governance." Antonyuk, 120 F.4th at 992 (noting that "city people have long had a different relationship with guns than their rural neighbors, a relationship generally marked by greater concern about interpersonal violence") (citing Joseph Blocher, Firearm Localism, 123 YALE L. J. 82, 98–103, 112–21 (2013)). Indeed, based on this historical tradition, the Second Circuit recently held, inter alia, that certain New York licensing regulations "that afford a modicum of discretion to issuing officers" are consistent with the Nation's tradition of firearm regulation and the Second Amendment. Id. at 994, 998-99.

For the foregoing reasons, the Court hereby dismisses plaintiffs' complaint in full with prejudice. Clerk to enter judgment.

SO ORDERED.

Dated: New York, NY
      December 4, 2024

JED S. RAKOFF, U.S.D.J.