# No. 24-3308

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

———————————

CHARLES MILLS, CRAIG SOTOMAYOR & BRADEN HOLLIDAY,

*Appellants*,

v.

NEW YORK CITY,

*Appellee.*

———————————

On Appeal from the United States District Court for the
Southern District of New York, No. 1:24-cv-7460 (Rakoff, J.)

———————————

**BRIEF FOR *AMICUS CURIAE* NATIONAL SHOOTING SPORTS
FOUNDATION, INC. IN SUPPORT OF APPELLANTS**

———————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

March 31, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), National Shooting Sports Foundation, Inc., certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................... i

TABLE OF AUTHORITIES.................................................................................. iii

INTRODUCTION & INTEREST OF *AMICUS CURIAE* ...................................... 1

BACKGROUND ................................................................................................... 4

      A.    Legal Background ................................................................... 4

      B.    Procedural Background ......................................................... 9

ARGUMENT ...................................................................................................... 10

CONCLUSION .................................................................................................. 16

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
    50 Tenn. 165 (1871) ..............................................................................11

*Antonyuk v. James*,
    120 F.4th 941 (2d Cir. 2024) ........................................................ 3, 10

*Beckwith v. Frey*,
    No. 24-384 (D. Me. filed Nov. 12, 2024) ....................................7, 8

*Brown v. ATF*,
    704 F.Supp.3d 687 (N.D. W. Va. 2023) ...........................................11

*Brown v. Daikin Am. Inc.*,
    756 F.3d 219 (2d Cir. 2014) ..............................................................14

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016) ................................................................14

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) .............................................................11

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
    731 F.3d 199 (2d Cir. 2013) ..............................................................13

*Maryland Shall Issue, Inc. v. Moore*,
    116 F.4th 211 (4th Cir. 2024) ...........................................................11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)............................................................................13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)...........................................................2, 4, 8, 11, 12, 16

*Nguyen v. Bonta*,
    720 F.Supp.3d 921 (S.D. Cal. 2024) ........................................ 5, 8, 12

*Reese v. ATF*,
    127 F.4th 583 (5th Cir. 2025)............................................................11

iii

*Renna v. Bonta*,
    667 F.Supp.3d 1048 (S.D. Cal. 2023) ...................................................11

*Sedita v. United States*,
    2025 WL 387962 (D.D.C. Feb. 4, 2025) ...........................................11

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) .............................................................11

*United States v. Daniels*,
    101 F.4th 770 (10th Cir. 2024) ...........................................................2

*United States v. Hicks*,
    649 F.Supp.3d 357 (W.D. Tex. 2023) ................................................11

*United States v. McNulty*,
    684 F.Supp.3d 14 (D. Mass. 2023) ....................................................11

*United States v. Rahimi*,
    602 U.S. 680 (2024) ............................................................... 2, 8, 13

*United States v. Williams*,
    442 F.3d 1259 (10th Cir. 2006) .........................................................14

*Wade v. Johnson Controls, Inc.*,
    693 F.2d 19 (2d Cir. 1982) ................................................................14

*Yukutake v. Lopez*,
    No. 21-16756, --- F.4th ---, 2025 WL 815429
    (9th Cir. Mar. 14, 2025) ............................................................11, 12

## Constitutional Provision

U.S. Const. amend. II ........................................................................... 2, 4

## Statutes and Rule

18 U.S.C. §922(t) ....................................................................................6

18 U.S.C. §923(3)(A) ..............................................................................6

Conn. Gen. Stat. §29-33(f) .....................................................................5

Md. Code Ann., Pub. Safety §5-101(r) ...................................................5

iv

Md. Code Ann., Pub. Safety §5-128 ................................................5

Md. Code Ann., Pub. Safety §5-129 ................................................5

N.J. Stat. §2C:58-2(a)(7)................................................5

N.J. Stat. §2C:58-3(*i*) ................................................5

N.Y.C. Admin. Code §10-302.1(f) ................................................3

N.Y.C. Admin. Code §10-302.1(g) ................................................3, 7

N.Y.C. Admin. Code §10-302.1 historical note 1 ................................1

Va. Stat. §18.2-308.2:2................................................5

Fed. R. Evid. 201(b)(2) ................................................ 14

**Other Authorities**

ATF, *Don't Lie for the Other Guy* (Dec. 20, 2024),
https://bit.ly/4i5tbxn ................................................2

Gov't Accountability Off., GAO-09-709, *Firearms Trafficking*
(June 2009), https://bit.ly/4bD1NEu................................................6

Larry Keane, *Egregious 'Straw Purchase' Plea Deal a Slap in
Firearm Industry Face*, NSSF (Dec. 11, 2024),
https://bit.ly/3DokEGT ................................................ 15

Graham Moomaw, *Gun groups sue to block Virginia's new one-
handgun-a-month law*, Virginia Mercury (June 15, 2020),
https://bit.ly/41TN0SH ................................................5

NSSF, *Don't Lie for the Other Guy* (2025), https://bit.ly/3Dv58J9................15

U.S. Dep't of Justice – Off. of Inspector Gen., *Review of ATF's
Project Gunrunner* (Nov. 2010), https://bit.ly/3XBzS24 ................................6

## INTRODUCTION & INTEREST OF *AMICUS CURIAE*[1]

The National Shooting Sports Foundation, Inc. ("NSSF") is the trade association of the firearm, ammunition, hunting, and shooting-sports industries. NSSF has approximately 10,000 members, including federally licensed manufacturers, distributors, and retailers of firearm and ammunition; manufacturers, distributors, and retailers of numerous other products for the hunting, shooting, and self-defense markets; public and private shooting ranges; gun clubs; sportsmen's organizations; and endemic media. To promote, protect, and preserve the shooting sports and America's hunting tradition, NSSF often submits *amicus* briefs in cases involving laws implicating Second Amendment freedoms. The law at issue here, New York City Administrative Code §10-302.1, amply fits the bill: Section 10-302.1 blanketly prohibits New Yorkers from buying more than one gun in a 90-day period, based on the suspicion that anyone seeking to obtain multiple firearms over a three-month span may be a criminal straw purchaser with plans to "diver[t] [the] gun[] to the illegal marketplace." N.Y.C. Admin. Code §10-302.1 historical note 1.

To be clear, NSSF and its members enthusiastically support the goal of identifying and stopping illegal straw purchases. For over 25 years, NSSF has partnered with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives

---

[1] No party's counsel authored this brief in whole or in part. No person other than NSSF and its members contributed money intended to fund preparing or submitting this brief. Counsel for all parties consented to the filing of this brief.

("ATF") to support the "Don't Lie for the Other Guy" campaign combatting straw purchasing. *See* ATF, *Don't Lie for the Other Guy* (Dec. 20, 2024), https://bit.ly/4i5tbxn. But NSSF and its members also have a vested interest in protecting the Second Amendment rights of law-abiding citizens, and in ensuring sound development of the historical approach to the Second Amendment announced in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). The decision below cannot be squared with that precedent.

Simply put, nothing in our Nation's historical tradition of firearm regulation supports restricting successive firearm purchases by law-abiding citizens. Such laws, currently enforced only in New York City and a handful of outlier states, are the *ne plus ultra* of a twenty-first century regulatory innovation at odds with the very premise of the Second Amendment: that "the people" can be trusted "to keep and bear Arms" unless and until there is a particular reason to think otherwise as to a specific individual. *See* U.S. Const. amend. II. Respecting that premise, our Nation's historical tradition has always "distinguishe[d]" permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others," *United States v. Rahimi*, 602 U.S. 680, 698-700 (2024), from impermissible laws that "look with suspicion on citizens presumably exercising their Second Amendment rights in a lawful way," *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024). Section 10-302.1 falls squarely in the

latter camp: It is a total ban on virtually all New Yorkers' ability to purchase multiple guns over a three-month span, premised entirely on the suspicion that anyone seeking multiple guns over a three-month span might be a criminal.[2]

The district court failed to grapple with that tradition at all. In a single paragraph of cursory analysis, with no citation, the court sidestepped *Bruen*'s historical inquiry altogether. According to the district court, history need not enter the equation unless a law "permanently deprive[s] applicants of their right to own and carry firearms"; any other law, the court held, withstands Second Amendment scrutiny no matter how ahistorical it may be. App.57.

That radical reasoning is flatly inconsistent not just with the Supreme Court's decisions in *Bruen* and *Rahimi*, but also with this Court's decision in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), each of which "requires courts to engage in two analytical steps when assessing Second Amendment challenges: first, by interpreting the plain text of the Amendment as historically understood; and second, by determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation." *Id.* at 968. By waving off Plaintiffs' challenge to

---

[2] Section 10-302.1 exempts only law enforcement officers, state officials, members of the military, federally licensed firearm dealers, entertainment companies holding a special theatrical permit, certain designated companies and certain employees thereof, people seeking to exchange a firearm purchased in the last 30 days, and people who can prove that a previously purchased firearm was "stolen or irretrievably lost" in the last 30 days. N.Y.C. Admin. Code §10-302.1(f)-(g).

Section 10-302.1 with no historical evidence whatsoever, the district court elided the second step entirely. At the very least, then, this Court should remand for the district court to apply the proper standard and hold the City to its burden of producing a historical record to justify Section 10-302.1. But because the legal questions are so straightforward—a law prohibiting people from acquiring a new firearm obviously implicates the Second Amendment, and just as obviously finds zero support in this Nation's historical tradition—the Court should go further and reverse.

## BACKGROUND

### A.    Legal Background

1.  Since the advent of the firearm, it has been an unfortunate reality that some people want firearms for illicit purposes. Yet the Founders nevertheless saw fit to "enshrine" in the Constitution "'the right of the people to keep and bear Arms.'" *Bruen*, 597 U.S. at 20, 26, 50 (quoting U.S. Const. amend. II). Consistent with that "unqualified command," *id.* at 17, states and the federal government have experimented over the centuries with various measures to prevent firearms from falling into the wrong hands: *e.g.*, bans on possession by individuals likely to misuse them; background checks to identify individuals subject to such disqualifications; and permits and licenses to carry firearms outside the home. But no government imposed any sort of temporal limit on the amount of firearms a law-abiding citizen could purchase until the 1990s. What is more, such laws remain exceptionally rare

4

today:  only five outlier states—California, Connecticut, Maryland, New Jersey, and Virginia—limit law-abiding citizens who pass a background check to buying a certain number of firearms over a set period of time.  And even in those states, the laws generally focus on handguns, and they typically provide exceptions for people with a concealed-carry license.[3]

Federal law takes the opposite approach.   Implicitly recognizing the constitutional difficulties with limiting law-abiding citizens to a single "Arm," Congress instead elected to impose a heightened reporting requirement on federally licensed firearm dealers "whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers,

---

[3] Besides California, which has an across-the-board one-gun-a-month law (which was recently struck down, *see Nguyen v. Bonta*, 720 F.Supp.3d 921, 938-39 (S.D. Cal. 2024), *appeal pending*, No. 24-2036 (9th Cir.)), the four other states' laws are far more limited.  Connecticut has limited law-abiding citizens to three handguns per month (six if the citizen is a certified firearms instructor) since 2023.  *See* Conn. Gen. Stat. §29-33(f).  Maryland, for its part, has limited law-abiding citizens to one handgun or specific kinds of semiautomatic rifles and shotguns per month since 2003, unless the person applies for approval from the state police.  *See* Md. Code Ann., Pub. Safety §§5-101(r), 5-128, 5-129.  Virginia initially passed a one-handgun-per-month law back in 1993, only to repeal it in 2012, before resurrecting a new version in 2020.  *See* Graham Moomaw, *Gun groups sue to block Virginia's new one-handgun-a-month law*, Virginia Mercury (June 15, 2020), https://bit.ly/41TN0SH. The new version applies only to handguns, exempts concealed-carry permitholders, and allows law-abiding citizens to request a discretionary exemption from state law enforcement.  *See* Va. Stat. §18.2-308.2:2.  And, finally, New Jersey similarly limits law-abiding citizens to one handgun a month.  *See* N.J. Stat. §§2C:58-2(a)(7), 2C:58-3(*i*).

or any combination of pistols and revolvers totaling two or more" to the same person. 18 U.S.C. §923(3)(A). That reporting requirement—which must be "forwarded" to state or local law enforcement "not later than the close of business on the day that the multiple sale or other disposition occurs" *id.*—buttresses but does not displace the background check required by 18 U.S.C. §922(t). Put differently, the primary mechanism to combat straw purchasing under federal law (and in the overwhelming majority of states) remains a background check that entails an individualized determination of whether a specific purchaser is a law-abiding citizen eligible to acquire a firearm.

And all signs suggest that such individualized determinations, reinforced with the heightened federal reporting requirements, have proven successful at identifying and stopping illicit straw purchases. *See, e.g.*, U.S. Dep't of Justice – Off. of Inspector Gen., *Review of ATF's Project Gunrunner* 36 (Nov. 2010), https://bit.ly/3XBzS24 ("[M]ultiple sales reports provide ATF with timely, actionable leads that can enable it to more quickly identify suspected firearms traffickers and disrupt their operations."); Gov't Accountability Off., GAO-09-709, *Firearms Trafficking* 25 (June 2009), https://bit.ly/4bD1NEu ("[I]nformation ATF is able to maintain on certain firearms purchases, such as information on some multiple firearms purchases, enables ATF to more quickly trace those firearms if they turn up in crime because the information is already entered into a searchable database.").

6

2.  For its part, Section 10-302.1 eschews a modest reporting requirement in favor of a sweeping suspicion that anyone seeking to purchase multiple guns in a three-month span might be a criminal straw purchaser.  In doing so, Section 10-302.1 lunges well past the handful of state laws discussed above.  As explained, those laws generally limit successive purchases for a 30-day window; Section 10-302.1 stretches the prohibition three times as long.  And with California's law enjoined, the successive-purchase limits currently enforced apply only to handgun purchases (and in Maryland's case, certain specified rifles and shotguns); Section 10-302.1, by contrast, applies to almost every firearm under the sun.  *See* N.Y.C. Admin. Code §10-302.1(g) (exempting only antiques).  Maryland and Virginia both allow law enforcement to make discretionary exceptions when a citizen faces imminent threats of violence, *see supra* n.3; Section 10-302.1 brooks no comparable exception, *see supra* n.2.

Such blanket mistrust of repeat firearms purchasers is not just unprecedented; it is unwarranted.  As current litigation in the District of Maine highlights, people commonly acquire a firearm after learning about a credible threat of imminent violence against themselves or their family.  *See, e.g.*, *Beckwith v. Frey*, No. 24-384 (D. Me. filed Nov. 12, 2024), Dkt.1-1 ¶¶3, 6, 9, 15-17; Dkt.1-3 ¶¶6-7; Dkt.1-4 ¶9. There is nothing remotely suspect about a law-abiding citizen wanting to buy one gun effective for home defense, and a different gun she can safely and comfortably

carry on her person or in her car; if anything, buying guns one can safely and comfortably use in specific circumstances is the responsible thing to do. *Cf. id.* Dkt.1-2 ¶¶4-5. Nor is there anything illegitimate about hunters and other outdoor enthusiasts buying multiple firearms before (or during) a hunting or camping trip. *See id.* Dkt.1-3 ¶8 (noting that such purchases arise "frequently").

Such blanket mistrust also fits uncomfortably, to put it mildly, with *Bruen* and *Rahimi*. Not only are firearms the only type of personal property that the Constitution explicitly marks for protection against government interference, but the historical tradition of firearm regulation established during the Founding and Reconstruction eras consistently "distinguishe[d]" (1) permissible efforts to keep firearms out of the hands of "citizens who have been found to pose a credible threat to the physical safety of others" from (2) impermissible efforts to "broadly restrict arms use by the public generally," without regard to any individualized concerns. *Rahimi*, 602 U.S. at 698, 700. At the very least, there is fair reason to doubt whether a law first passed in New York City in 2005—and unknown entirely until the 1990s—that burdens every law-abiding citizens' ability to purchase multiple guns in a given period of time on the off-chance that a few might be criminal straw purchasers can be squared with the original meaning of the Second Amendment. *See Nguyen*, 720 F.Supp.3d at 935-39 (rejecting the historical analogues urged by California in defense of its one-gun-a-month law); *see also Bruen*, 597 U.S. at 34-

37 (overturning a 1905 law and noting that, when it comes to our nation's historical tradition of firearms regulation, "not all history is created equal"; "post-Civil War discussions of the right to keep and bear arms … do not provide as much insight into [the Second Amendment's] original meaning," and though "belated innovations of the mid- to late-19th-century" can "confirm[]" original meaning, "to the extent [this] later history contradicts" earlier understandings of "what the text says, the text controls").

### B.    Procedural Background

Plaintiffs challenge Section 10-302.1 and several other New York City ordinances "restrict[ing] conduct protected by the Second and Fourteenth Amendments." App.42.  The district court did not dispute that the "regulations at issue apply to conduct that falls within the activities governed by the plain text of the Second Amendment as historically understood."  App.56.  And although the district court acknowledged that, under *Bruen*, once "the Second Amendment's plain text covers the conduct at issue," the only question remaining is ordinarily "whether the challenged law is consistent with this Nation's historical tradition of firearms regulation," App.56-57, the district court never reached that question.  Instead, the court purported to distinguish *Bruen* on the ground that the regulations challenged here do not "operate[] to permanently deprive applicants of their right to own and carry firearms."  App.57.  As the district court saw things, "so long as" a law leaves

9

open *some* avenue for "ordinary citizens" with "a general desire for self-defense" to "keep and bear arms," the law "do[es] *not* infringe upon rights" even presumptively "protected by the Second Amendment." App.58-59 (emphasis original).

## ARGUMENT

The district court's approach is profoundly out of step with not just *Rahimi*, *Bruen*, and *Antonyuk*, but the very notion that the Second Amendment protects a fundamental right. As this Court recognized in *Antonyuk*, the Supreme Court's recent Second Amendment cases obligate lower courts to follow a "framework" that eschews means-ends balancing and instead focuses on "text" and "history." 120 F.4th at 964. First, "a court must … consider whether 'the Second Amendment's plain text covers an individual's conduct,'" "interpreting the plain text of the Amendment as historically understood." *Id.* at 964, 968 (quoting *Bruen*, 597 U.S. at 24). "If so," then "[t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 964 (first alteration in original). The answer to the first question here is plainly yes, so the district court should have put the City to its historical burden. Its failure to do so alone justifies vacatur. But because the legal questions Section 10-302.1 implicates are so straightforward, and the district court's resolution so profoundly wrong, the Court should go further and reverse outright. Section 10-302.1 is unconstitutional.

1. Applying *Bruen*'s first step here is simple. As the Ninth Circuit recently explained, any law that "regulates and burdens the acquisition of firearms by ordinary citizens"—which Section 10-302.1 plainly does—"regulates conduct that is covered by the text of the Second Amendment and 'presumptively protect[ed]' by it." *Yukutake v. Lopez*, No. 21-16756, --- F.4th ---, 2025 WL 815429, at *18 (9th Cir. Mar. 14, 2025) (brackets in original) (quoting *Bruen*, 597 U.S. at 24). Indeed, the commonsense conclusion that "th[e] right of keeping arms" "necessarily involves the right to purchase and use them" has been a feature of judicial opinions from 1871, *Andrews v. State*, 50 Tenn. 165, 178 (1871), to the present, *e.g.*, *Reese v. ATF*, 127 F.4th 583, 589-90 (5th Cir. 2025).[4] And rightly so, as "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether." *Id.* at 590.

---

[4] *See also, e.g.*, *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 230 (4th Cir. 2024) (en banc) (Rushing, J., concurring) ("Maryland's law regulates acquiring a handgun, and the Second Amendment's text encompasses that conduct."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms[.]" (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Sedita v. United States*, 2025 WL 387962, at *8 (D.D.C. Feb. 4, 2025); *Brown v. ATF*, 704 F.Supp.3d 687, 700 (N.D. W. Va. 2023); *United States v. McNulty*, 684 F.Supp.3d 14, 20 (D. Mass. 2023); *Renna v. Bonta*, 667 F.Supp.3d 1048, 1065 (S.D. Cal. 2023); *United States v. Hicks*, 649 F.Supp.3d 357, 359 (W.D. Tex. 2023).

11

To be sure, it is not the case that "any regulation[] affecting firearms," no matter how tangentially, is automatically "swe[pt] into the scope of the protections afforded by the Second Amendment." *Contra* App.57-58. But there is nothing tangential about Section 10-302.1's relationship to firearms. The law applies *only* to firearms, and its whole effect is to keep "Arms" out of the hands of law-abiding citizens. It is thus beyond obvious that the conduct Section 10-302.1 restricts—keeping and bearing Arms—is covered by the plain text.

2. Because Section 10-302.1 burdens and regulates the acquisition of firearms by law-abiding citizens, the City "must carry its burden" under *Bruen*'s second step "to 'justify its regulation by demonstrating that [Section 10-302.1] is consistent with the Nation's historical tradition of firearm regulation.'" *Yukutake*, 2025 WL 815429, at *18 (quoting *Bruen*, 597 U.S. at 24); *Nguyen*, 720 F.Supp.3d at 933-35 (same for California's one-gun-a-month law). But this case never got that far: Before reaching *Bruen*'s historical inquiry, the district court fashioned its own off-ramp, purporting to distinguish *Bruen* and *Rahimi* because Section 10-302.1 does not "operate[] to permanently deprive applicants of their right to own and carry firearms." App.57.

To state the district court's conclusion is to refute it. The "special need" requirement at issue in *Bruen* did not permanently deprive applicants of their right to own and carry firearms, but the Supreme Court subjected it to historical scrutiny all the same. Despite claiming to "give[] considerable weight" even to Supreme

court "*dictum*," App.58.n.3 (emphasis original), the district court lost the plot:  The question at *Bruen*'s second step is not whether requiring someone to wait 90 days between firearm purchases "permanently deprive[s] applicants of their right to own and carry a firearm"; the question is whether requiring someone to wait 90 days between firearm purchases can be said to be "part of an enduring American tradition" of firearm regulation.  597 U.S. at 69-70; *see also Rahimi*, 602 U.S. at 692 ("[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition").

All told, just as a law restricting First Amendment activity based on its frequency is subject to heightened constitutional scrutiny, *see Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013), a law restricting Second Amendment activity based on frequency must be subject to *Bruen*'s historical inquiry.  In reaching a contrary result, the district court impermissibly treated the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion).

The district court also stood *Bruen*'s burden-shifting framework on its head.  As is true in other areas of law involving burden-shifting frameworks, when a Second Amendment plaintiff adequately pleads that he seeks to engage in conduct falling within the original meaning of the Second Amendment, "the burden of

13

production" unambiguously shifts to the defendant, and as a result, the case "is not properly decided on a motion to dismiss for failure to state a claim." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230-31 (2d Cir. 2014); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 55 n.8 (2d Cir. 2016) (cautioning "district courts against imposing too high a burden … at the 12(b)(6) stage" when a plaintiffs' claims are subject to burden shifting). Even when a court thinks that Second Amendment plaintiffs are "unlikely to prevail" at *Bruen*'s second step, that "does not justify denying them an opportunity to litigate their claims." *Wade v. Johnson Controls, Inc.*, 693 F.2d 19, 22 (2d Cir. 1982). And here, of course, there is every reason to think that Plaintiffs will succeed.

That is not to say that every Second Amendment plaintiff is entitled to extensive discovery and trial. Quite the opposite, a Second Amendment defendant can usually carry its burden by asking the district court to take judicial notice of historical laws and regulations in connection with a motion for judgment under Rule 12(c) or Rule 56. *See United States v. Williams*, 442 F.3d 1259, 1261 (10th Cir. 2006) ("That the courts are allowed to take judicial notice of statutes is unquestionable."); *see also* Fed. R. Evid. 201(b)(2). But what a Second Amendment defendant cannot do is short-circuit its *Bruen* step-two burden by filing a motion to dismiss. Because that is exactly what New York City attempted—and the district court blessed—this Court must reverse and remand.

\*     \*     \*

14

None of this should be taken to suggest that preventing straw-purchasing is not vitally important, or that New York City is somehow powerless to pursue that goal. For example, the City could mirror federal law by imposing a heightened reporting requirement on firearms dealers who sell multiple firearms to the same person over a given period of time. The City could work with ATF and NSSF on the "Don't Lie for the Other Guy" campaign, which helps dealers identify and stop potential straw purchases.[5] And the City can buttress those preventative mechanisms with robust prosecutions and stiff penalties for those who break the law, as NSSF routinely calls for.[6] But if the City seeks to reduce straw purchases by constricting conduct falling within the original understanding of the Second Amendment—as Section 10-302.1 does—then the City bears the heavy burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition

---

[5] *See generally* NSSF, *Don't Lie for the Other Guy* (2025), https://bit.ly/3Dv58J9 ("The goal of the Don't Lie for the Other Guy™ program is to reduce firearm straw purchases at the retail level" through "educational program[ming] to assist firearm retailers in detecting and preventing 'straw purchases,' the illegal purchase of a firearm by one person for another," and "to educate would-be straw purchasers of the penalties of knowingly participating in an illegal firearm purchase").

[6] *See, e.g.*, Larry Keane, *Egregious 'Straw Purchase' Plea Deal a Slap in Firearm Industry Face*, NSSF (Dec. 11, 2024), https://bit.ly/3DokEGT ("The firearm industry believes deeply in [its] efforts to keep firearms out of the hands of those who should not possess them.… [I]nitiatives, including Don't Lie, have shown real results towards making our communities safer, while also promoting lawful and responsible gun ownership.").

of firearm regulation." *Bruen*, 597 U.S. at 24.  The City must be held to that burden on remand.

## CONCLUSION

The Court should reverse and remand.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
MATTHEW D. ROWEN
KEVIN WYNOSKY
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

March 31, 2025

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1. This brief complies with Local Rule 29.1(c)'s type-volume limitation because, according to Microsoft Word for Microsoft 365's word-count function, the brief contains 3,834 words, excluding the parts that Federal Rule of Appellate Procedure 32(f) exempt from the word count.

2. This brief complies with Federal Rule of Appellate Procedure 332(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

On March 31, 2025, an electronic copy of this Brief for *Amicus Curiae* was filed with the Clerk of Court using the AMCS system and thereby served upon all counsel appearing in this case.


<u>s/Erin E. Murphy</u>
Erin E. Murphy