# 24-3308

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUT

―――――――――――――――

CHARLES MILLS, CRAIG SOTOMAYOR, and BRADEN HOLIDAY,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY, NEW YORK,

*Defendant-Appellee,*

.

―――――――――――――――

On Appeal from the United States District Court
for the Southern District of New York

―――――――――――――――

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

―――――――――――――――

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163

Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
smesiya@everytown.org
(202) 517-6624

June 30, 2025

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................... 1

ARGUMENT ......................................................................................... 3

    I.    New York City's Anti-Trafficking Law Plays a Critical Role in Combatting the Persistent and Dangerous Problem of Straw Purchasing ........................................................................... 3

    II.   If the Court Finds It Necessary to Reach *Bruen-Rahimi*'s Historical Analysis, It Should Remand for Further Proceedings ..................................................................... 14

    CONCLUSION ............................................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   11 F.4th 138 (2d Cir. 2021) .............................................................14

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023) ..........................................................15

*Florez v. CIA*,
   829 F.3d 178 (2d Cir. 2016) .......................................................14, 15

*Miller v. Smith*,
   No. 22-1482, 2023 WL 334788 (7th Cir. Jan. 20, 2023) ....................16

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ......................................................................1-2, 15

*Palmer v. Lombardo*,
   No. 22-15645, 2023 WL 11952669 (9th Cir. May 26, 2023) ..............16

*Taveras v. New York City*,
   No. 21-398, 2022 WL 2678719 (2d Cir. July 12, 2022).....................15

*United States v. Rahimi*,
   602 U.S. 680 (2024) ......................................................................... 2

*Zherka v. Bondi*,
   --- F.4th ----, 2025 WL 1618440 (2d Cir. June 9, 2025) ....................16

## Other Authorities

144 Cong. Rec. 11637 (1998),
   https://tinyurl.com/4amhy6mp........................................................ 6

Anthony A. Braga et al., *Underground Gun Markets and the Flow of
   Illegal Guns into the Bronx and Brooklyn: A Mixed Methods
   Analysis* (2020), 98 J. Urban Health 596 (2020),
   https://pubmed.ncbi.nlm.nih.gov/32888157/ .....................................13

Anthony A. Braga, *Long-Term Trends in the Sources of Boston Crime
   Guns*, 3 RSF: The Russell Sage Found. J. Soc. Scis. 76 (2017)........ 7-8

iii

Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce & Trafficking Assessment, Vol. II, Part III: Crime Guns Recovered and Traced Within the United States and its Territories* (2024), https://tinyurl.com/34s4ecpx .......................9, 13

Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment, Vol. III, Part VI: Characteristics of Firearm Traffickers, End Users, and Defendants* (2024), https://tinyurl.com/mr3zy6k3 .................................................. 4

Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Firearms Commerce and Trafficking Assessment, Vol. III, Pt. III: Firearm Trafficking Channels and Methods Used* (2024), https://tinyurl.com/c7mesrvv............................................................13

Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) .......................................................................7, 12

Gabrielle LaMarr LeMee & Connor Sheets, *Buying guns for criminals: Easy, illegal, and 'extremely difficult' to stop*, LA Times (Dec. 7, 2023), https://www.latimes.com/california/story/2023-12-07/gun-dealers-story-2-straw-purchases .......................................................10

New York City Administrative Code § 10-302.1 ...........................*passim*

NSSF, 2023 Firearm Industry Compliance Webinar Series, *Let's Take a Look at Your Straw Purchase Avoidance Program* (2023), https://perma.cc/W2QF-DNKR............................................................ 9

Press Release, U.S. Attorney's Office, Southern District of New York, *Husband and Wife Charged in Interstate Gun Trafficking Scheme* (May 25, 2022), https://www.justice.gov/usao-sdny/pr/husband-and-wife-charged-interstate-gun-trafficking-scheme.........................10, 11

The Virginia Center for Public Safety, *Fact Sheet on Virginia's One-Handgun-a-Month Law*, https://perma.cc/Q84K-KSAE....................................................6, 7, 8

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged New York City firearms-related laws and regulations are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v.*

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

*Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), for the reasons set out in the City's brief, Dkt. No. 42 ("City Br."). Everytown submits this amicus brief to expand on two points in support of these restrictions.

*First*, we dispel the suggestion of Plaintiffs' amicus, the National Shooting Sports Foundation ("NSSF"), that the City's anti-trafficking law (New York City Administrative Code § 10-302.1) is an unnecessary solution to a nonexistent concern. Straw purchasing is a serious problem that is greatly exacerbated by the ability to buy multiple guns in a limited period. New York City enacted the anti-trafficking law two decades ago to address this important public safety issue. It remains a vital—and constitutional—means of doing so today.

*Second*, as the City has explained, this Court should uphold the challenged restrictions at the initial, textual step of the *Bruen-Rahimi* test. If, however, this Court disagrees, it should remand to the district court for further proceedings at the second, historical step. This brief provides further support for why remand would be the appropriate course under those circumstances.

2

## ARGUMENT

### I. New York City's Anti-Trafficking Law Plays a Critical Role in Combatting the Persistent and Dangerous Problem of Straw Purchasing

New York City's anti-trafficking law targets a specific problem through a precise measure: it limits the acquisition of firearms to one handgun and one long gun every ninety days to combat the persistent and serious problem of straw purchasing. As the City has explained, and the district court correctly found, this law is constitutional. *See* City Br. 25-30; JA60-61. Contrary to the suggestions of an amicus brief supporting plaintiffs, *see* NSSF Br. 6, it is also a crucial measure for combatting gun trafficking and "the proliferation of illegal handguns" and for preserving public safety, *see* N.Y.C. Admin. Code § 10-302.1 note 2.

Straw purchasing is a retail gun transaction in which the ostensible buyer (the straw purchaser) purchases the firearm for a third party rather than for the buyer's own use. By using a straw purchaser, the third party—the ultimate recipient—can obtain firearms from a licensed dealer without presenting identification or undergoing a background check. Firearms sold to straw purchasers typically end up in the hands of convicted felons or other dangerous individuals who are

3

legally prohibited from owning or buying firearms. *See* Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), *National Firearms Commerce and Trafficking Assessment, Vol. III, Part VI: Characteristics of Firearm Traffickers, End Users, and Defendants* 13 (2024), https://tinyurl.com/mr3zy6k3 (last updated Apr. 4, 2024) (indicating that 59.6 percent of end users of trafficked firearms are convicted felons, 29.1 percent are known gang members or associates, and 22.1 percent are drug traffickers).

Straw purchasing is a pervasive and significant problem, just as it was twenty years ago when the City passed the anti-trafficking law. At the time, New York City's analysis of the data revealed that "prevent[ing] the diversion of guns to the illegal marketplace" through straw purchasing was "imperative" in "preventing gun violence." N.Y.C. Admin. Code § 10-302.1 note 1. In particular, the City was driven by the following considerations:

- ATF data demonstrating that a large percentage of guns identified in urban trafficking investigations that involved juveniles were trafficked by straw purchasers or straw purchasing rings;

- ATF's determination that "purchases of multiple handguns at the same time are a strong indicator of straw purchases and, therefore, of illegal handgun trafficking";

4

- A loophole in federal and New York state law, frequently exploited by illegal handgun traffickers, that allowed "a purchaser, once approved, to buy as many guns at a time as he or she likes"; and

- A finding that "[h]aving a straw purchaser buy more than one handgun at a time allows traffickers to work quickly, efficiently, and without involving more criminal confederates than necessary."

*Id.* note 2. "Due to the importance in illegal gun sales of multiple purchases by straw purchasers," the City decided to "limit[] or prohibit[] multiple sales by licensed dealers" as a method of "inhibit[ing] gun crime and illegal gun trafficking." *Id.*

Equally notable is what the anti-trafficking law does *not* do. The law does not constrain an individual's first firearm purchase, nor does it impose any ceiling on the total number of firearms that a person may accumulate over time. A licensee may acquire up to four handguns and four rifles or shotguns each year (and, after five years, for example, could own twenty handguns and twenty rifles or shotguns consistent with the law).[2] New York City residents authorized to possess firearms

---

[2] The 90-day period for handgun purchases and transfers is separate from the 90-day period for purchases and transfers of rifles and shotguns. *See* N.Y.C. Admin. Code § 10-302.1(a)-(b).

thus may collect large numbers of firearms subject to the regulation, which has limited the bulk purchases of firearms in the City for roughly two decades now.

The City's approach—limiting multiple firearms sales to curtail straw purchasing—was not a novel or untested one. Other states, including South Carolina, Virginia, and Maryland, had implemented similar regimes and seen successful results. Virginia, for example, a "major source state[] for illegal handguns being seized on the east coast," passed a one-handgun-a-month law in 1993 to limit bulk gun sales. *See* 144 Cong. Rec. 11637 (1998) (testimony of Captain R. Lewis Vass from Sept. 2, 1998), https://tinyurl.com/4amhy6mp. In addition to "impeding the volume of handguns that traffickers can resell illegally on the secondary market," Virginia lawmakers sought to address law enforcement's "key concern" "that illegal gun trade leaving Virginia can be a mechanism for bringing illegal drugs into the state, as weapons often are exchanged for drugs instead of money." The Virginia Center for Public Safety, *Fact Sheet on Virginia's One-Handgun-a-Month Law* 1-2, https://perma.cc/Q84K-KSAE ("Virginia Center for Public Safety").

Virginia's plan worked. A 1996 study found that significantly fewer crime guns were thereafter traced back to Virginia dealers, demonstrating that "limiting the purchase of handguns to no more than 1 per month per person is an effective means of disrupting the illegal interstate transfer of firearms." Douglas S. Weil & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759, 1761 (1996).[3] A separate analysis by the Virginia State Crime Commission in 1996 also concluded that the law "had its intended effect of reducing Virginia's status as a source state for gun trafficking." Virginia Center for Public Safety, at 2 (citation omitted). And another study on the impact of Virginia's law on Boston crime guns reached similar results as well. *See* Anthony A. Braga,

---

[3] The study's analysis of firearms tracing data showed a "strong, consistent pattern" in which guns recovered in criminal investigations that were "originally obtained in the Southeast are significantly less likely to be … traced to Virginia if they were purchased *after* the Virginia law went into effect." Weil & Knox*, supra*, 275 JAMA at 1761 (emphasis added). Specifically, for "gun traces originating in the Northeast, the likelihood that a gun would be traced to Virginia relative to gun dealers elsewhere in the Southeast for guns purchased after the 1-gun-a-month law took effect when compared with guns purchased prior to the law's effective date was reduced 66%." *Id.* at 1760. And for a traced gun recovered anywhere in the nation, the likelihood it was acquired in Virginia relative to another southeastern state after the law took effect dropped by 36%. *Id.*

7

*Long-Term Trends in the Sources of Boston Crime Guns*, 3 RSF: The Russell Sage Found. J. Soc. Scis. 76, 89-90 (2017) (finding that after Virginia's law took effect, the "likelihood that a Boston handgun would be traced to a Virginia FFL relative to licensed dealers elsewhere in I-95 southern states decreased by 66.3 percent," and that its results "are congruent with the findings of Weil and Knox's 1996 study"). Indeed, the law was so effective in limiting straw purchases, the ATF "dropped Virginia from first to eighth on its list of East Coast source states for guns used in criminal activity." Virginia Center for Public Safety, at 2 (citation omitted).

New York City took note of these successes in enacting its own anti-trafficking law. *See* N.Y.C. Admin. Code § 10-302.1. Its legislative history specifically referred to Virginia's success and that of nearby states, observing that:

> After South Carolina and Virginia enacted one-handgun-per-month laws, their significance as suppliers of crime guns to Northeastern states diminished sharply. In the year after Maryland passed a similar law, it experienced a fourteen percent drop in homicides. Moreover, the number of crime guns seized in the adjacent District of Columbia that had first been bought at retail in Maryland dropped from twenty to zero.

*Id.* note 2.

8

Ignoring the compelling evidence that purchase limitations curtail trafficking, Plaintiffs' amicus makes the rather astounding claim that "all signs suggest that" background checks and federal reporting requirements have "proven successful at identifying and stopping illicit straw purchases," such that the anti-trafficking law is unnecessary and "unwarranted." NSSF Br. 6-7. But even a cursory review of the data—including NSSF's own materials—quickly dispels this baseless claim. *See* NSSF, *2023 Firearm Industry Compliance Webinar Series: Let's Take a Look at Your Straw Purchase Avoidance Program*, at 31 (2023), https://perma.cc/W2QF-DNKR (estimating in 2023 that "[a]lmost half of all illegal gun trafficking results from straw person sales"). According to the ATF, nearly 60% of guns recovered from crimes in 2021 that could be traced to a purchaser and/or possessor were likely obtained via straw purchasing. *See* ATF, *National Firearms Commerce & Trafficking Assessment, Vol. II, Part III: Crime Guns Recovered and Traced Within the United States and its Territories* 26 (2024), https://tinyurl.com/34s4ecpx (last updated Apr. 4, 2024) [hereinafter "*NFCTA, Crime Guns Recovered*"]; *see also id.* at 27 (noting similar percentage for 2017 to 2021). There is no question that straw

9

purchasing remains "the linchpin of most firearms trafficking operations" and "a grave threat to public safety." Gabrielle LaMarr LeMee & Connor Sheets, *Buying guns for criminals: Easy, illegal, and 'extremely difficult' to stop*, LA Times (Dec. 7, 2023), https://www.latimes.com/california/story/2023-12-07/gun-dealers-story-2-straw-purchases (alteration adopted).

Put simply, NSSF is wrong to suggest that gun trafficking is already under control. And the harms of trafficking are felt particularly keenly in New York City, whose vast population makes it a major market for illegally trafficked firearms. Consider, for example, the case of Ronald and Anauncia Rogers, who pled guilty to conspiracy to commit firearms trafficking in connection with their scheme to move dozens of guns from the retail market in Georgia to the black market in New York City. *See* Press Release, U.S. Attorney's Office, Southern District of New York, *Husband and Wife Charged in Interstate Gun Trafficking Scheme* (May 25, 2022), https://www.justice.gov/usao-sdny/pr/husband-and-wife-charged-interstate-gun-trafficking-scheme.[4] According to the

---

[4] *See* Judgment at 1, *United States v. Ronald Rogers*, No. 1:22-cr-00321 (S.D.N.Y. Oct. 13, 2023), Dkt. No. 67; Transcript of Plea Hearing at 9, 22, *United States v. Anauncia Rogers*, No. 1:22-cr-00321 (S.D.N.Y.

government's evidence, the Rogers purchased "at least 68 firearms from at least seven federal firearms licensees ('FFLs') in Georgia." *Id.* Ronald Rogers transported the firearms to New York City. *See id.* At least six were recovered in the course of arrests in the City—including one recovered from a 16-year-old, one from an 18-year-old, and one from a 20-year-old. *See* Sentencing Submission at 4, *United States v. Ronald Rogers*, No. 1:22-cr-00321, (S.D.N.Y. Oct. 6, 2023), Dkt. No. 64. Ronald Rogers boasted about his activities on social media and in text exchanges, including messages recognizing how he profited from illegal activity. *See id.* at 1-7 (including, among others, a text from Ronald Rogers discussing making most money "when ppl die and others want to retaliate").

The Rogers' case illustrates the broad and active market for straw-purchased guns in New York City, and it highlights the error in any suggestion that background checks and reporting requirements are adequate to prevent trafficking into that market. Indeed, the Rogers' numerous transactions were conducted at multiple *federally licensed*

---

Aug. 2, 2023), Dkt. No. 56. Ronald Rogers also pled guilty to firearms trafficking. *See* Judgment at 1.

11

*retailers* in Georgia—that is, each of the transactions was subject to the background check and reporting requirements that Plaintiffs' amicus insists have been "successful at identifying and stopping" straw purchases. *See* NSSF Br. 5-6. And these are guns that then had to be driven *nearly 900 miles* from stores in the South Atlanta area to New York City, requiring complex planning and logistics. Eliminating the anti-trafficking law would greatly simplify the process of supplying the illegal market in the City, and, inevitably, increase the supply of firearms to that market. *See* Weil & Knox, *supra*, 275 JAMA at 1761 (concluding that success of Virginia's one-handgun-a-month law supports theory that "prohibiting multiple handgun purchase transactions … is an effective policy means to disrupt established gun-trafficking patterns while ultimately reducing the supply of firearms in the illegal market").

Moreover, the Rogers' case is not an anomaly. To the contrary, straw purchases from federally licensed dealers who are subject to federal reporting requirements and whose customers undergo federal background checks represent one of the leading—and growing—sources for trafficked firearms. *See* ATF, *National Firearms Commerce and*

12

*Trafficking Assessment, Vol. III, Pt. III: Firearm Trafficking Channels and Methods Used* 1-2 (2024), https://tinyurl.com/c7mesrvv (last updated Apr. 4, 2024). In New York, for example, a whopping 79.7% of recovered and traceable crime guns originate from out-of-state federal firearms licensees. *See NFCTA, Crime Guns Recovered* at 39; *see also* Anthony A. Braga et al., *Underground Gun Markets and the Flow of Illegal Guns into the Bronx and Brooklyn: A Mixed Methods Analysis* (2020), 98 J. Urban Health 596, 605-06 (2020), https://pubmed.ncbi.nlm.nih.gov/32888157/ ("Traceable crime guns [recovered by the NYPD in the Bronx and Brooklyn] overwhelmingly originate from first retail sales at out-of-state licensed dealers (especially Pennsylvania and I-95 Southern states).").

New York City recognized these kinds of issues decades ago; indeed, the ability of straw purchasers and traffickers to obtain firearms in bulk despite existing federal and state regulations served as the impetus behind the enactment of the anti-trafficking law. *See* N.Y.C. Admin. Code § 10-302.1 note 2. The anti-trafficking law thus serves as a critical part of New York City's efforts to curb gun violence in our communities.

13

## II. If the Court Finds It Necessary to Reach *Bruen-Rahimi*'s Historical Analysis, It Should Remand for Further Proceedings

All of Plaintiffs' claims, including their challenge to the anti-trafficking law, fail at the initial, textual step of the *Bruen-Rahimi* test for the reasons set out in the City's brief. This Court should therefore affirm the district court's judgment without reaching the second, historical step. If, however, the Court disagrees, it should remand to allow for a full and definitive step-two ruling from the district court on a developed historical record. *See* City Br. 18, 46.

Remand under these circumstances would align with this Court's "general policy that the trial court should consider arguments—and weigh relevant evidence—in the first instance." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021) (quoting *Florez v. CIA*, 829 F.3d 178, 189 (2d Cir. 2016)). Here, the parties did not submit historical evidence or brief step-two issues in the district court. Nor do they do so on appeal. Indeed, in its motion to dismiss, the City expressly reserved the right, if needed, to make *Bruen* step-two arguments following discovery. *See* Def's Mem. in Supp. of Mot. to Dismiss at 25 n.16, *Mills v. New York City*, No. 1:23-cv-07460 (S.D.N.Y.

14

Dec. 8, 2023), Dkt. No. 15. And while the district court stated that Plaintiffs' challenges "would likely fail" at the second, historical step of the *Bruen-Rahimi* test, it rested its dismissal of those claims "for failure to survive step one." JA65. A remand to permit the parties to develop the historical record and allow the district court an opportunity to weigh in with a full step-two analysis and ruling thus would comport with this Court's "precedent, judicial efficiency, and common sense." *Florez*, 829 F.3d at 183.

A remand under circumstances like this is particularly warranted in the Second Amendment context. As the Supreme Court has emphasized, "[c]ourts are … entitled to decide [Second Amendment] case[s] based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6. And thus, since *Bruen*, appellate courts have remanded many Second Amendment cases to allow "parties [to] have a full and fair opportunity to develop their positions before the district court in accordance with the principles of party presentation." *Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023); *see also, e.g.*, *Taveras v. New York City,* No. 21-398, 2022 WL 2678719, at *1 (2d Cir. July 12, 2022) (remanding to allow the parties and the district court to address

and apply *Bruen*'s text-and-history test); *Palmer v. Lombardo*, No. 22-15645, 2023 WL 11952669, at *1 (9th Cir. May 26, 2023) (remanding to allow the parties "to develop the historical and factual record" in the district court); *Miller v. Smith*, No. 22-1482, 2023 WL 334788, at *1 (7th Cir. Jan. 20, 2023) (remanding to "allow the parties to engage in further discovery, including seeking additional expert reports" and to "receive the full benefit of the district court's decision").[5] If the Court finds that any of Plaintiffs' claims survive step one of the *Bruen-Rahimi* test, it should follow that same approach here.

---

[5] In *Zherka v. Bondi*, --- F.4th ----, 2025 WL 1618440 (2d Cir. June 9, 2025), another Second Amendment case, this Court agreed with the government that a remand was unnecessary—explaining that "there [we]re no relevant unsettled questions of fact" and it "ha[d] the full benefit of the parties' respective *Bruen*-based arguments." *Id.* at *4. That is not the situation here with respect to the second, historical step of the *Bruen-Rahimi* test, making *Zherka* inapposite on this point.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: June 30, 2025                 Respectfully submitted,

/s/Sana Mesiya
Sana S. Mesiya
Everytown Law
P.O. Box 14780
Washington, D.C. 20044
(202) 517-6624
smesiya@everytown.org

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163

*Counsel for amicus curiae
Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) and Local Rules 29.1(c) and 32.1(a)(4)(A) because this brief contains 3,156 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: June 30, 2025              /s/Sana S. Mesiya

                                   Sana S. Mesiya
                                   *Counsel for amicus curiae*
                                   *Everytown for Gun Safety*